**In re TRIPLE B OIL PRODUCERS, INC., Debtor.**

**TRIPLE B OIL PRODUCERS, INC., Plaintiff,**

v.

**R.W. PUDER, et al., Defendants.**

**Bankruptcy No. 86–30226.
Adv. No. 86–0296.**

United States Bankruptcy Court, S.D. Illinois.

June 11, 1987.

Joel A. Kunin, E. St. Louis, Ill., for plaintiff.

Gregory D. Willard, St. Louis, Mo., and Paul A. Croegaert, Olney, Ill., for Ledder.

Wm. F. Kopis, Belleville, Ill., and Lloyd A. Palans, St. Louis, Mo., for Puder.

Steven Goldstein, St. Louis, Mo., for Bank.

## ORDER

KENNETH J. MEYERS, Bankruptcy Judge.

## INTRODUCTION

This matter is before the Court on plaintiff's complaint for declaratory judgment. On July 12, 1984 plaintiff/debtor, Triple B Oil Producers, Inc. ("Triple B"), entered into a certain Equipment Lease Agreement ("Agreement") with defendants R.W. Puder ("Puder") and E.J. Ledder ("Ledder"). Triple B subsequently filed a petition for relief under Chapter 11 on February 28, 1986, and on July 2, 1986 moved to reject the Agreement pursuant to 11 U.S.C. § 365. Defendant Mark Twain Bank objected to plaintiff's motion on the basis that the Agreement is not a "true lease," but rather a security agreement for the conditional sale of the equipment in question. Defendant Puder, who was represented by counsel at trial, apparently agrees that the Agreement is in fact a financing transaction. In a brief opening statement, counsel for Triple B stated that plaintiff likewise agrees with Mark Twain's position, and that Triple B would therefore not participate further in the trial.

The issue this Court must decide is whether the Agreement between Triple B, Puder and Ledder is a "true lease" or a lease intended as security. If the Agreement constitutes a true lease and is rejected by the estate, the equipment will be returned to Puder and Ledder. If the Agreement is a financing device, the equipment becomes property of the estate and is subject to Mark Twain's allegedly perfected security interest in all equipment of Triple B.

## FINDINGS OF FACT

In 1980, Triple B was in need of additional equipment, but lacked the necessary capital and could not economically borrow additional funds to purchase such equipment. Puder and Ledder, who were then officers and shareholders of Triple B, and who were able to secure more favorable interest rates, obtained personal loans from Olney Bank & Trust to purchase equipment for the corporation's use. The cost of the equipment was $622,708.00. Triple B then "leased" the equipment from Puder and Ledder at the rate of 2.5% of cost per month. Triple B initially made "lease" payments directly to Olney Bank. Puder testified that this was done as a matter of administrative convenience, and that Triple B later made payments directly to Puder and Ledder. (Puder Dep. at 33.)

In 1982, Puder, Ledder and Triple B executed a written "lease," backdated to May 1980, that reflected the prior oral "leasing" arrangement. This lease expired in June 1983, and from that time until July 1984, there was again no written agreement, although the same "leasing" arrangement continued. In July 1984, Puder, Ledder and Triple B then entered into the Equipment Lease Agreement that is at issue in this case. The Agreement was for a term of five years, and was considered by the parties to be a continuation of the earlier "lease." (Puder Dep. at 31; Ledder Dep. at 41.) The Agreement combined Triple B's obligations for the equipment with separate corporate obligations to Ledder and Puder under promissory notes. During the initial two years of the Agreement, all payments were apparently allocated to the notes. The parties agreed, both orally and in writing, that Triple B's "lease" payments would vary as interest rates varied on Puder's and Ledder's loans at Olney Bank. (Puder Dep. at 80; Ledder Dep. at 18–20, 99.) In addition, the "lease" payments were scheduled to continue until June 30, 1989, at which time the individuals' obligations on their loans would be fulfilled.[1] (Puder Dep. at 32; Ledder Dep.

---

1. In his deposition, Puder testified that a "gentlemen's agreement" authorized Triple B to have full title to the equipment whenever Triple B could pay in full the Puder and Ledder bank

at 95.) Triple B's payments over the nine year "lease period" totalled $1,325.025.92.

## DISCUSSION

There are certain general principles that apply in determining whether a particular document is a lease or a security agreement. For example, "[a]lthough an agreement is denominated a lease, if the substantive provisions indicate it is in fact a sale, it will be deemed a sale. The parties cannot change the legal effect of an instrument simply by giving a name to it." *In re Loop Hospital Partnership,* 35 B.R. 929, 932 (B.R.Ct.N.D.Ill.1983). "The instrument may disguise actual intentions and therefore it is important to analyze beyond the document's face." *Id.*

Section 1–201(37) of the Uniform Commercial Code establishes more specific standards for determining whether a lease is a "true lease" or a security agreement. That section provides, in pertinent part, as follows:

> Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

Section 1–201(37) has been interpreted as requiring two basic elements for a security agreement to exist: "1) [T]he lessee must be obligated to make rental payments roughly equivalent to the leased property's cost plus interest, and 2) the lessor must lack a residual value in the leased property at the termination of the lease." *Id.* at 933. A finding that the lessor possesses no economically meaningful residual value in the property at the termination of the "lease" may be indicated "by the existence of a nominal option price roughly equiva-

lent to the fair market value of the leased property at the end of the term ..." *Id.* If, however, "the parties anticipated that the property would have significant market value at the time the option to acquire would be exercised, the lessor has a residual value in the property and a lease is indicated." *Id.*

There is no absolute standard for determining whether an option price is nominal. Although some cases suggest that an option to purchase for fair market value "creates an inference that the consideration is other than nominal," *In re Berge,* 32 B.R. 370, 372 n. 5 (B.R.Ct.W.D.Wis.1983), the same cases sometimes note that "fair market value" may in fact be nominal. *See,* e.g., *In re Berge,* 32 B.R. at 372 n. 5; *Loop Hospital,* 35 B.R. at 933–34. Other cases have held that the option price is nominal if it is less than 25% of the original purchase price. *See Percival Construction Co. v. Miller & Miller Auctioneers,* 532 F.2d 166, 171 (10th Cir.1976). The Seventh Circuit has expressly held that "in determining whether an option price is nominal, the proper figure to compare it with is not the actual fair market value of the leased goods at the time the option arises, but their fair market value at that time *as anticipated by the parties when the lease is signed.*" *Matter of Marhoefer Packing Co., Inc.,* 674 F.2d 1139, 1144–45 (7th Cir. 1982) (emphasis added).

In the present case, the 1980 "lease" did not contain an option to purchase. However, the 1984 Agreement, which is the document at issue, contains an option to purchase that provides: "Upon expiration of the Agreement Term and fulfillment by Lessee of all of its obligations hereunder, the Lessors shall sell the equipment to the Lessee for its then fair market value."

■ Mark Twain argues that the "option to purchase" clause mandates the sale of the equipment to Triple B at the expiration of the "lease," and that under U.C.C. § 1–201(37), the "lease" is therefore a security agreement.[2] The Court finds, how-

---

loans. Ledder testified that no such agreement existed.

**2.** Mark Twain cites the following language from section 1–201(37) in support of its position: "[A]n agreement that upon compliance with the

ever, that this clause does not mandate a sale of the equipment to Triple B, but rather obligates the "lessors" to sell the equipment for fair market value *if* Triple B exercises its option to purchase. This interpretation is supported by another provision in the Agreement that requires the property to be returned to the "lessors" upon termination of the "lease."[3]

Mark Twain further argues that even if the "lease" does not require the sale of the equipment, the Agreement is nonetheless a financing device since the parties anticipated, at the time the document was executed, that Triple B would purchase the equipment for nominal value. In order to determine whether the parties anticipated that Triple B would purchase the equipment for nominal value, it is helpful to consider both the condition of the equipment in July 1984 and the state of the oil industry in 1984. The testimony on both factors is conflicting.

■ Bob Summers, defendant Ledder's expert, testified in his deposition that the equipment was worth approximately $331,-200.00 in July 1984. He further testified that assuming there were no significant changes in the oil industry in Southern Illinois, and further assuming that the equipment was properly maintained, it would lose only 20% of its value between July 1984 and June 1989 (and would thus have more than nominal value). Mark Twain has requested the Court to strike all of the testimony of Mr. Summers on the basis that it is predicated on two unreliable documents, both of which were prepared by unknown individuals or individuals who did not testify in this case.[4] (One document, a written appraisal of the equipment in question, was excluded as hearsay during the trial of this case.) However, Mr. Summers,

who had thirty-five years of experience in the oil business, also testified that he was familiar with the equipment in July 1984, and that his opinion as to its value at that time was based upon his personal knowledge of the equipment. (Summers' Dep. at 9, 19.) The Court finds that the witness' background in the oil field and his familiarity with the equipment make him competent to testify as to the value of the equipment in 1984. The Court also notes, however, that Summers' testimony with regard to the equipment's value in 1989 is somewhat weakened since his opinion was based on an assumption that there were no significant changes in the economy affecting the oil industry. While certain evidence supports such an assumption, other credible evidence indicated that the economic outlook for the oil business was gloomy in July 1984.

Mark Twain's expert, Pete Pletz, appraised the equipment on May 1, 1987, and testified that its current fair market value is $129,000.00, approximately 21% of its original cost. The equipment's present fair market value, however, is irrelevant—the equipment's value in 1984 is clearly more indicative of what the parties anticipated its value to be in 1989. Additionally, the evidence at trial suggested that the equipment had not been used nor properly maintained for some time. These factors could obviously contribute to the equipment's current fair market value. Pletz further testified that even assuming Summers' estimated value of $331,200.00 (in July 1984) to be true, the equipment would retain only 15% to 20% of its fair market value by 1989. In other words, the equipment would be worth $50,000.00 to $82,000.00 in 1989, or 8% to 13% of its original cost. He further testified that the oil market had

---

terms of the lease the lessee *shall become* ... the owner of the property ... does make the lease one intended for security" (emphasis added).

3. Paragraph 6 of the Agreement provides in part: "Upon the termination of the lease with respect to any item of equipment, such item of equipment shall be returned to the Lessors in good repair ... for such disposition as the Lessors shall determine."

4. Counsel for defendant Ledder asked Summers the following question during his deposition: "Do you have an opinion as to whether or not that appraisal of Don Gordon reflects the fair market value of [the] equipment on or about the date it was prepared, which was April 16th of 1984?" (Summers' Dep. at 11.)

begun to decline by July 1984; Mark Twain argues that this decline further supports a finding that the parties anticipated the equipment to have a nominal value in 1989.

There are two problems with Pletz's testimony. First, he was not familiar with the equipment's condition in 1984. Therefore, it is difficult to understand the basis for his conclusion that the equipment would retain only 15% to 25% of its fair market value by 1989. Second, while there is evidence that oil prices had begun to decline in 1984, this factor alone (without further evidence of the equipment's condition and value in 1984) is insufficient to show that the parties anticipated the equipment's fair market value to be nominal in 1989. In short, there is little, if any, evidence supporting Mark Twain's position that Puder and Ledder intended to sell the equipment to Triple B for nominal value when the "lease" terminated.

Puder did testify in his deposition that the parties had agreed that Triple B could purchase the equipment for a nominal sum. (Puder Dep. at 62, 71.) There is no other testimony to this effect. Moreover, the Court finds that Puder's testimony lacks credibility for the following reasons.

■ Puder and Ledder personally guaranteed Mark Twain's loan to Triple B in the event of any deficiency. Although Ledder settled with Triple B, Mark Twain's suit against Puder is currently pending in state court. Mark Twain contends that the state litigation is totally irrelevant to any issue in this proceeding. The Court disagrees. Should the instant Agreement be construed as a security agreement, Mark Twain may succeed in enforcing its security interest, thereby obtaining the value of all of the subject equipment, not just Puder's one-half. This would obviously reduce Puder's exposure on his personal guaranty. The Court can only conclude that Puder is not a particularly credible witness in light of his apparent self-interest in having the "lease" declared a security agreement. Therefore, in the absence of evidence that the parties intended, at the time the "lease" was signed, to sell the equipment to Triple B in 1989 for nominal value, the Court cannot

find, as a matter of law, that the "lease" is a security agreement.

■ Mark Twain further argues that even if the residual value of the equipment is substantial, the totality of circumstances demonstrates that the purported lease is a financing device. Specifically, Mark Twain contends that the following lease provisions demonstrate a transfer of the incidents of ownership to Triple B: Lessee's obligation to 1) bear the risk of loss, 2) insure the equipment, 3) make all repairs and perform maintenance, 4) pay taxes, and 5) indemnify the lessor. Mark Twain also contends that because the total amount of rent under the "lease" substantially exceeds the cost of the equipment, the transaction is in effect a financing device. Other courts have found these factors relevant in determining whether a "lease" is actually a security agreement. *See, e.g., Matter of Marhoefer,* 674 F.2d at 1145; *Loop Hospital,* 35 B.R. at 935–37. However, the cases also note that "such factors are less persuasive as they are essentially matters of contract negotiation." *In re International Plastics, Inc.,* 18 B.R. 583, 588 (B.R. Ct.D.Kan.1982). As stated by the Court in *Loop Hospital,* "[these] factors are basically irrelevant as they can also appear in true leases, and merely add to the confusion in analyzing these cases ... A better indicator of intended ownership is the parties' anticipation of the fair market value at the end of the agreement." *Id.* at 936.

## CONCLUSION

Under section 1–201(37) of the Uniform Commercial Code, if a lease contains an option to purchase that allows the lessee to become the owner of the property for nominal consideration, the lease is in effect a security agreement. In determining whether an option price is nominal, the Court must consider whether the parties intended, at the time the lease was signed, to sell the property for nominal value at the termination of the lease. In the present case, Mark Twain has failed to present sufficient evidence demonstrating that Puder and Ledder intended to sell the equipment to Triple B for a nominal sum.

Although Mark Twain argues that other lease provisions demonstrate the Agreement is a financing device, these provisions also appear in "true leases" and are therefore irrelevant to the issue in this case.

Accordingly, for the reasons stated above, the Court finds that the Agreement is a "true lease" and not one intended for security.