In re Susan Elaine TAYLOR, Debtor.

BANTERRA BANK, Plaintiff,

v.

SUBWAY EQUIPMENT LEASING
CORP., Defendant.

Bankruptcy No. 96–40204.
Adversary No. 96–4084.

United States Bankruptcy Court,
S.D. Illinois.

June 12, 1997.

Michelle Vieira, Carbondale, IL, for plaintiff.

Alan G. Gerson, St. Louis, MO, for defendant.

## OPINION

KENNETH J. MEYERS, Bankruptcy Judge.

This matter is before the Court on cross-motions for summary judgment on Banterra Bank's Complaint to Determine Extent, Validity, and Priority of Liens. The issue before the Court is whether an agreement between the debtor and the defendant constitutes a "true lease" or whether it is, in fact, a disguised security agreement pursuant to § 1–201(37) of the Illinois Uniform Commercial Code.

## FACTS

The debtor in this case, Susan Elaine Taylor, owned several Subway Sandwich Shops in southern Illinois. In August 1993, she entered into an agreement with the defendant, Subway Equipment Leasing Corporation ("Subway"), to "lease" equipment valued at $26,009.75 for her restaurant in Herrin, Illinois. Pursuant to the terms of the agreement, debtor, in addition to making a security deposit of $2,500, was required to make monthly payments of $702.27 for a term of 60 months.

Although Subway reserved the right to terminate the contract in the event of default, there was no provision that expressly allowed the debtor to terminate the agreement. The only way the debtor could be free of the obligations of the "lease" prior to expiration of the sixty month term was to purchase the equipment. Attached to the agreement was a "buyout calculation schedule" which indicated the buyout option price for the equipment after each month of the lease. According to that schedule, at the expiration of sixty months, the debtor had the option to purchase the equipment for $2,600.97.[1] The contract specifically provided that the debtor was entitled only to the exclusive use of the property and that title to the equipment would remain in Subway unless and until the debtor exercised the purchase option. Subway Lease, ¶ 16.

On February 7, 1994, the debtor executed a promissory note and security agreement in favor of the plaintiff, Banterra Bank ("Banterra"). In connection with that transaction, the debtor granted Banterra a security interest in the equipment that was the subject of the Subway agreement. At this time, the debtor had not exercised her option to purchase the equipment from Subway. Banter-

---

1. The contract provided that Ms. Taylor could apply her security deposit against this amount so, at the conclusion of the "lease," she could own the equipment by paying an additional $100.97.

ra subsequently filed a UCC–1 financing statement with the Illinois Secretary of State evidencing its security interest.

On February 28, 1996, the debtor filed for Chapter 7 bankruptcy protection. Banterra then filed this adversary proceeding to determine the validity and priority of its lien. The parties agreed to have the subject equipment sold and the proceeds placed in the Court registry pending the resolution of this adversary. It is undisputed that the equipment was sold to a third party for $14,058.47.

Banterra argues that the contract between the debtor and Subway is not a "true lease," but is, rather, a security agreement subject to UCC filing requirements. The Bank maintains that because Subway failed to file a UCC financing statement perfecting its interest in the equipment,[2] its lien is superior to that of Subway's and, therefore, it is entitled to recover the proceeds of the sale. Subway, on the other hand, argues that its agreement with the debtor is, in fact, a lease which was violated by the debtor when she granted the Bank a security interest in the equipment. Subway maintains that the debtor actually had no ownership interest in the property to give to Banterra and that the Bank's lien, therefore, is void.

### DISCUSSION

It is well established that the existence, nature, and extent of a security interest in property is controlled by state law. *In re Powers*, 983 F.2d 88 (7th Cir.1993); *In re Meeks*, BK No. 95–40734 (Bankr.S.D.Ill.Dec.

**2.** The agreement between the debtor and Subway authorized Subway to file a financing statement if it wished to do so. Paragraph 17 of that contract specifically states: "It is understood between the Lessor and the Lessee that this agreement is regarded by them as a true lease and not a contract for security[,] and the reservation by the Lessor of the right to file a financing statement is solely for the purpose of allowing it to maintain on record a notice of its right in the equipment." Subway Lease at ¶ 17.

**3.** Section 1–201(37) was amended effective January 1, 1992. The previous version of the statute required that the agreement be analyzed in light of the parties' intent. It stated, in pertinent part:

Whether a lease is intended as security is to be determined by the facts of each case; however,

15, 1995). The standard for determining whether a transaction constitutes a "true lease" or a security agreement is set forth in Section 1–201(37) of the Illinois Uniform Commercial Code. Pursuant to that provision,

[w]hether a transaction creates a lease or a security interest is determined by the facts of each case; however, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease *not subject to termination by the lessee;* and

\* \* \* \* \* \*

(d) *the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.*

810 ILCS 5/1–201(37) (emphasis added).

In any analysis under § 1–201(37), the intent of the parties is no longer the primary consideration.[3] Rather, the focus is on the "economic realities" of the transaction. *Meeks* at 4; *In re Lerch*, 147 B.R. 455, 460 (Bankr.C.D.Ill.1992); William D. Hawkland et al, *Article 9: Secured Transactions; Sales of Accounts, Contract Rights and Chattel Paper* § 9–102:04 (1996). Under this approach, the lease will be construed as a security interest as a matter of law if the debtor cannot terminate the lease *and* one of the enumerated requirements is satisfied. *Lerch* at 460. If the Court determines that the transaction is not a disguised security agree-

(a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does not make the lease one intended for security. Ill.Rev.Stat. ch. 26, ¶ 1–201(37). Under the prior codification, the courts adopted numerous subjective tests to discern the parties' actual intent. However, because leases and security agreements can sometimes share common characteristics, these "tests" often produced unreliable and inconsistent results. For this reason, the section was amended to provide a more objective standard for distinguishing between the two types of transactions. *See* J. White & R. Summers, *Uniform Commercial Code,* § 30–3(b) (4th ed.1995).

ment *per se*, it must then look at the specific facts of the case to determine whether the "economics of the transaction" suggest such a result. *Id.; Meeks* at 4.

In determining whether the transaction in this case is a security agreement as a matter of law, the first issue the Court must address is whether the agreement is subject to termination by the debtor/lessee. While the defendant admits that the agreement does not expressly provide the debtor with the right to terminate the agreement, it maintains that the monthly "buyout" provisions in the contract are the equivalent of an option to terminate and should be construed as such. The Court disagrees.

The Seventh Circuit has issued two opinions which discuss a lessee's right to terminate a lease under § 1–201(37). In *In re Marhoefer Packing Co., Inc.*, 674 F.2d 1139 (7th Cir.1982), the lessee entered into a four-year lease of equipment. The agreement provided that at the end of the lease term, the lessee could either terminate the contract and return the property with no further obligation, purchase the equipment for a substantial sum, or renew the contract for an additional four-year term. If the lessee chose to renew the lease, it was then given the option to purchase the equipment for one dollar at the conclusion of the term. The court, in explaining why the *Marhoefer* transaction was not a security agreement as a matter of law, stated:

> In our view, the conclusive presumption provided under [section 1–201(37)] applies only where the option to purchase for nominal consideration necessarily arises upon compliance with the lease (citation omitted). It does not apply where the lessee has the right to *terminate the lease before that option arises with no further obligation to continue paying rent.*

*Id.* at 1142–43 (emphasis added).[4]

Similarly, in *Powers v. Royce Inc.*, 983 F.2d 88 (7th Cir.1993), the Seventh Circuit

found that the agreement in question was a "true lease," even though it contained an option to purchase the goods for nominal consideration at the end of the lease term, because it allowed the lessee to terminate the agreement after the initial two-week rental period without any further obligation. In comparing the leases in *Marhoefer* and *Powers*, the court noted that

> the Marhoefer contract resemble[d] the Royce Agreements in one critical respect: under both agreements, the lessee was under no obligation to make the installment payments that would ultimately allow the lessee to exercise or refuse the option to own the goods.... In other words, [in the Marhoefer contract], *because the lessee could terminate the lease at any time,* the presence of an option to acquire the goods for a nominal price did not convert the leases into installment sales. The same conclusion applies to the Royce Agreements: even though the lessee [could] acquire the goods at the end of the lease's term, the lessee [was] under *no obligation to make the payments that [would] allow him to exercise the option.*

*Powers*, 983 F.2d at 91 (emphasis added). *See also TKO Equipment Co. v. C & G Coal Co.*, 863 F.2d 541, 543 (7th Cir.1988) (lease found to be a "true lease," even though it contained a buyout option, where lessee could have returned the goods without obligation).

Reasoning from these decisions, it follows that an option to terminate a lease differs from a buyout option in that, under a termination clause, a lessee is free to cease performance under the contract without incurring further obligation. In this case, the lease did not provide the debtor with the opportunity to *terminate* the agreement at any time. Rather, in order to be released from this agreement, the debtor was required to purchase the property pursuant to the defendant's buyout schedule. She could

---

4. In support of its reasoning the *Marhoefer* court quoted:

> It is ... essential in order to make a conditional sale ... that the buyer should be bound to take title of the property, or at least to pay the price for it. Therefore, a lease which provides for a certain rent in installments *is not a condi-*

*tional sale if the buyer can terminate the transaction at any time by returning the property* ....

*Id.* at 1143 (*quoting* S. Williston, *The Law Governing Sales of Goods at Common Law and Under the Uniform Sales Act* § 336, p. 528 (1909)) (emphasis added).

not simply return the equipment to the defendant and walk away. The lease here was not subject to termination by the debtor and, therefore, satisfies the first criterion for finding a security agreement under § 1–201(37).

The Court must now address the second criterion, which is whether the option to purchase the equipment at the end of the lease constituted nominal consideration. Unfortunately, there is no "bright line" test for determining "nominal" consideration. Some courts have evaluated the nominality of an option price by comparing it to the total rent to be paid. *National Equip. Rental Ltd. v. Priority Electronics Corp.*, 435 F.Supp. 236, 238–239 (E.D.N.Y.1977). Still others have compared the option price to the original cost of the equipment. *Percival Constr. Co. v. Miller & Miller Auctioneers*, 532 F.2d 166, 171 (10th Cir.1976).[5] The standard for determining nominality in the Seventh Circuit was announced in *Marhoefer* where the Court held:

> [I]n determining whether an option price is nominal, the proper figure to compare it with is not the actual fair market value of the leased goods at the time the option arises, but their fair market value at that time *as anticipated by the parties when the lease is signed.*

*Marhoefer*, 674 F.2d at 1144–1145. *See also In re Triple B Oil Producers, Inc.*, 75 B.R. 461 (Bankr.S.D.Ill.1987).

■ The parties here have stipulated that the equipment was worth $26,009.75 at the time the lease was signed. Further, there was evidence at the hearing on summary judgment indicating that the projected fair market value of the equipment after 60 months would be fifty-percent (50%) of its original value, or $13,004.88. Gilbert Stern Aff., Supp. to Pltf.'s Mot.Sum.Judg. at 2.[6] Pursuant to the Subway agreement, the debtor had the option to purchase the equipment after 60 months for $2,600.97 or approximately twenty-percent (20%) of that projected fair market value. Banterra argues that such an option price is "clearly nominal." The Court disagrees.

■ Section 1–201(37)(x) of the Illinois Uniform Commercial Code provides, in pertinent part, that additional consideration is nominal if "it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised." 810 ILCS 5/1–201(37)(x). This codification of what has traditionally been referred to as the "economic realities" test focuses on whether the lessee has, in light of all of the facts and circumstances, no sensible alternative but to exercise the purchase option. *In re Fogelsong* 88 B.R. 194 (Bankr.C.D.Ill. 1988). *See also* 1D Peter F. Coogan et. al, *Secured Transactions under U.C.C.* § 30.02[4][c][iii] (1990). Under this test, if only a fool would fail to exercise the purchase option, the option price is generally considered nominal and the transaction characterized as a disguised security agreement. *Fogelson* at 196; 4 J. White & R. Summers, *Uniform Commercial Code* § 30–3 at p. 13 (4th ed.1995). Applying this test to the facts here, it is evident that the option price representing twenty-percent of the equipment's projected fair market value is not so "economically compelling" that a lessee would have no reasonable alternative but to exercise the purchase option, and, therefore, this option amount does not constitute nominal

---

5. The court in *Percival Construction* adopted a "percentage test" as its guide for determining nominality. There, the court held that an option price that was less than 25% of the property's original value constituted nominal consideration. 532 F.2d at 171. Similarly, White and Summers take the position that payment of less than 50% of the predicted fair market value of the equipment should be considered nominal. 4 J. White & R. Summers, *Uniform Commercial Code*, § 30–3 (4th ed.1995). This Court declines to adopt such guidelines. Rather, the determination of nominality shall be made based on the facts and circumstances of each case.

6. At the hearing on summary judgment, when asked whether he disputed the valuation of the equipment contained in Mr. Stern's affidavit, Subway's counsel stated that he did not dispute the value so much as the fact that the plaintiff's valuation focused only on the option price at the end of the lease and not on the other option prices that were offered to the debtor/lessee throughout the course of the lease. In its brief Subway asserted that the projected fair market value of the equipment at the end of the 60–month term was the stated option price of $2,600.97. Def's Mem. Opp. Pltf's Mot. Sum. Judg. at 7.

consideration.[7] *See Western Enterprises, Inc. v. Arctic Office Machines, Inc.*, 667 P.2d 1232 (Alaska 1983) (court held that lower court finding that purchase option price in purported lease of 20% of value of property was not nominal).

■ Having concluded that the option price in this case is not nominal, the Court cannot, as a matter of law, categorize this contract as a security agreement under § 1–201(37). However, this conclusion does not necessarily render summary judgment inappropriate. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56; *In re Stevens*, No. 90–31144, Adv. No. 91–3061, slip op. at 2 (Bankr.S.D.Ill. Nov. 11, 1992). In this case, there is no dispute between the parties as to the material facts. Therefore, the Court can proceed to analyze the agreement in light of the following factors to determine whether the economics of the transaction indicate a security agreement rather than a "true lease": (1) whether the lessee has the option to renew the lease or to become the owner of the property; (2) whether the amount of rent exceeds the fair market value of the property; (3) whether the debtor is responsible for payment of taxes, insurance and other costs incident to ownership; and (4) whether the useful life of the property exceeds the length of the term of the lease. *In re Meeks*, No. 95–40734, slip op. at 5 (Bankr.S.D.Ill.Dec. 15, 1995). *See also Marhoefer*, 674 F.2d 1139; *In re Spears*, 146 B.R. 772 (Bankr.S.D.Ill.1992).

■ Although the agreement in this case does not grant the debtor a renewal option, it does grant the debtor an option to become the owner of the equipment. Section 1–201(37) specifically provides that "[a] transaction does not create a security agreement *merely* because it provides that ... the lessee has an option to renew the lease or to become the owner of the goods...." 810 ILCS 5/1–201(37)(c) (emphasis added). In evaluating the circumstances under which the existence of an option might create a security agreement, the Seventh Circuit has focused on whether the lessee has the right to terminate the agreement prior to exercising the purchase option. In *Marhoefer* the court held that the inclusion of a purchase option does not necessarily create a security agreement if the lessee also has a right to terminate the contract at any time prior to the option arising. *Marhoefer* 674 F.2d at 1143. Similarly, in *In re Powers*, 983 F.2d 88 (7th Cir.1993), the court concluded that the agreement in that case was a "true lease" because "even though the lessee [could] acquire the goods at the end of the lease's term, the lessee [was] under no obligation to make the payments that [would] allow him to exercise that option." *Id.* at 91. As explained above, the lessee in this case did *not* have the right to terminate the agreement at any time. The only way she could unburden herself from the lease obligations was to purchase the equipment. This rigidity suggests that the agreement in this case was not a lease but, rather, was one intended for security.

Second, the Court must consider whether the amount of rental payments due under the lease exceeds the fair market value of the property. Courts have generally held that "[i]f the total rental payments under the lease equal or exceed the purchase price, then a security agreement is indicated." 1D Coogan, *Secured Transactions Under U.C.C.* § 30.02[4][c][v] at 30–66. While the importance of this test has been reduced under the amendments to § 1–201(37), it is not without relevance. Under the current version of § 1–201(37),

[a] transaction does not create a security interest *merely* because it provides that:

(a) the present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or

---

7. Admittedly, the similarity between the amount of the security deposit and the amount of the final buyout is suspect. However, because the lease reserves to the lessee the option to have the deposit returned, the Court is constrained to find that $2,600.97 is the buyout amount rather than $100.

greater than the fair market value of the goods at the time the lease is entered into . . . .

810 ILCS 5/1–201(37)(a) (emphasis added). Again, although the Court cannot rely on this factor exclusively in classifying a contract as a security agreement, it is still an important consideration in evaluating the economics of the transaction. Here, the parties agree that the original value of the equipment was $26,009.75. Pursuant to the terms of the agreement, the debtor was obligated to make monthly rental payments of $702.27 to Subway for a period of sixty months. At the conclusion of the lease, the debtor would have paid $42,136.20 for the equipment, an amount substantially more than its fair market value. Therefore, this, too, is indicative of a security agreement rather than a lease.

 An analysis of the third factor further indicates that the agreement is not a lease but a security agreement. Under the agreement, the lessee bears all costs of insurance, taxes, and maintenance for the equipment as well as the risk of loss in the event of damage to the property. The Court is aware that the Seventh Circuit places minimal emphasis on this factor, having stated, in *Marhoefer*, that "[c]osts such as taxes, insurance and repairs are necessarily borne by one party or the other. They reflect less the true character of the transaction than the strength of the parties' respective bargaining positions." *Marhoefer* at 1146. However, the assignment of costs and risk in this case, when coupled with the fact that Subway disclaimed all warranties that are generally found in a lease, *is* a relevant consideration tending to show the agreement is not a "true lease." *See In re Maritt*, 155 B.R. 12, 13 (Bankr.D.Idaho 1993) (lessor's disclaimer of warranties is a relevant consideration in determining the actual nature of the parties' agreement).

By contrast, the final factor that must be analyzed, whether the useful life of the property exceeds the length of the term of the lease, supports a finding that the agreement is a lease. In general, courts have held that where the useful life of the property exceeds the term of the lease, the agreement is, in fact, a true lease. *Marhoefer* at 1145. Al-

though there was conflicting evidence at the hearing on summary judgment concerning the projected fair market value of the equipment at the end of the lease period, this discrepancy is irrelevant. Banterra's evidence indicates that after 60 months, the equipment in question would retain fifty-percent of its value ($13,000). Gilbert Stern Aff., Supp. to Pltf.'s Mot. Sum. Judg. at 2. Subway, on the other hand, argued that the fair market value of the equipment after 60 months would be only $2,600. It is undisputed that the property has subsequently been sold to a third party for $14,058.47. Thus, regardless of the figure the Court uses, it is evident the useful life of the property in this case would exceed the term of the lease.

Although the analysis under this final test favors a finding of a lease, consideration of all of the other factors leads the Court to conclude that the agreement is not a lease, but is, in fact, a security agreement. The problem with agreements such as the one in this case is that the lessors/drafters attempt to draft the document so that it is capable of functioning as either a lease *or* a security agreement, depending on the situation. While it is true that the agreement here has several characteristics of a lease, other more compelling features require its interpretation as a security agreement, the most significant being the absence of a right to terminate the agreement by the lessee. Therefore, for the reasons stated herein, the Court finds that the subject agreement is a security agreement rather than a true lease. Plaintiff Banterra Bank's motion for summary judgment is granted, and defendant's cross-motion for summary judgment is, accordingly, denied.