**In re GREENVILLE AUTO MALL, INC.**

No. 99–22119.

United States Bankruptcy Court,
N.D. Mississippi.

Jan. 31, 2001.

**416**

■
■

———

Wayne O. Lee, for Greenville Auto Mall, Inc.

Barbara L. Young, Field & Golan, for Bell & Howell Financial Services Company.

### OPINION

DAVID W. HOUSTON, III, Bankruptcy Judge.

On consideration before the court is an objection by Greenville Auto Mall, Inc., ("debtor"), to the claim filed by Bell & Howell Financial Services Co., f/k/a Bell & Howell Acceptance Corporation, ("Bell & Howell"); and the court, having reviewed same, as well as, the memoranda of law submitted by the parties, hereby finds as follows, to-wit:

### I.

The court has jurisdiction of the parties to and the subject matter of this proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(B) and (O).

### II.

On December 20, 1996, the debtor and Bell & Howell entered into a Subscription Services Agreement (hereinafter "SSA") whereby Bell & Howell would provide software and maintenance support for the computer system used by the debtor in its day to day operations. The term of the agreement was for 60 months with monthly payments calculated as follows:

$847.00 for months 1—12, $870.00 for months 13—24, $894.00 for months 25—36, $919.00 for months 37—48, and $945.00 for months 49—60

On February 10, 1997, the parties entered into an equipment lease whereby Bell & Howell leased certain computer equipment to the debtor. The term of this lease was for 60 months at a fixed rate of $334.65 per month. Both the SSA and the equipment lease contain language to the effect that Bell & Howell was to be reimbursed for all reasonable costs and expenses, including reasonable attorney's fees, incurred in protecting or enforcing its rights or remedies under the respective agreements.

Prior to filing its voluntary Chapter 11 petition on May 10, 1999, the debtor ceased its operations as an automobile dealership in Greenville, Mississippi. In September, 1999, Bell & Howell filed a proof of claim in the amount of $45,691,55, which arose from the aforementioned contracts.

In late June, 1999, the parties executed a stipulation and agreed order whereby the debtor rejected the SSA and the equipment lease. The automatic stay was lifted to permit Bell & Howell to recover the computer equipment. The final paragraph of the order recites that it shall not "affect, limit, or impair any unsecured, secured, or administrative expense claims" that Bell & Howell may have against the debtor's estate. This order, styled "Stipulation and Agreed Order Modifying Stay to Allow Bell & Howell to Terminate Lease and Recover Equipment and for Rejection of Executory Contracts" was entered by the court on July 1, 1999.

The proof of claim filed by Bell & Howell encompasses the remaining monthly payments due on both the SSA and the equipment lease. In addition, Bell & How-

ell seeks attorney's fees, as well as, late charges and sales tax. For reference purposes, the schedule of the Bell & Howell claim, as attached to the proof of claim, is as follows:

### SCHEDULE OF CLAIM

**CLAIMANT: Bell & Howell Financial Services Company**

#### I. SUBSCRIPTION SERVICES AGREEMENT—63873

| | | |
|---|---|---|
| Lease Commenced | – | January 20, 1997 |
| Bankruptcy Petition Filed | – | May 10, 1999 |
| Last Payment | – | March 20, 1999 |
| Term of Lease | – | 60 months |
| Lease Payments Made | – | 12 payments of $847.00 |
| | | 12 payments of $870.00 |
| | | 3 payments of $894.00 |

*Accelerated Lease Balance*
(Lease attached as Exhibit A)

| | |
|---|---|
| 9 payments of $894.00 (April 20, 1999–December 20, 1999) | 8,046.00 |
| 12 payments of $919.00 (January 20, 2000–December 20, 2000) | 11,028.00 |
| 12 payments of $945.00 (January 20, 2001–December 20, 2001) | 11,340.00 |
| | |
| Total Accelerated Balance | $30,414.00 |
| Late Charges | 45.24 |
| Sales Tax | 2,128.98 |
| | |
| *Subtotal* | **$32,588.22** |

#### II. EQUIPMENT LEASE AGREEMENT 63872

| | | |
|---|---|---|
| Lease Commenced | – | February 20, 1997 |
| Bankruptcy Petition Filed | – | May 10, 1999 |
| Last Payment | – | March 20, 1999 |
| Term of Lease | – | 60 months |
| Lease Payments Made | – | 26 payments of $334.65 |

*Accelerated Lease Balance*
(Lease attached as Exhibit B)

| | |
|---|---|
| 34 payments of $334.65 (April 20, 1999–January 20, 2002) | 11,378.10 |
| Late Charges | 20.04 |
| | |
| *Subtotal* | **11,398.14** |

| | |
|---|---|
| **III. ATTORNEYS FEES & COSTS** | 1,705.19 |
| (Statement of Attorney's Fees attached hereto) | |

| | |
|---|---|
| **TOTAL CLAIM:** | **$45,691.55** |

The debtor has objected to Bell & Howell's assertion that the remaining monthly payments, miscellaneous charges, and attorney's fees should be allowed as "rejection damages" under § 365 and § 502 of the Bankruptcy Code. The debtor asserts that both agreements were terminated through the agreed order entered on July 1, 1999, thereby extinguishing any future

payment obligations on the part of the debtor. Believing that there were no factual issues in dispute, the parties agreed to submit this matter to the court through memoranda of authorities.

### III.

■ A threshold issue to be addressed by the court is whether the equipment lease and SSA are two separate and distinct transactions or whether they are merely two components of a single agreement. The SSA was executed by a Bell & Howell representative on December 20, 1996. The Bell & Howell proof of claim indicates that payments commenced thereunder on January 20, 1997. The equipment lease was executed several weeks later on February 10, 1997. Payments commenced under this agreement on February 20, 1997. In the SSA, Bell & Howell agreed to provide the debtor with certain "hardware, software, and support services" in exchange for monthly payments. In the equipment lease, Bell & Howell purported to lease a computer system. The court presumes that the hardware, software, and support services, provided through the SSA, were used in conjunction with the operation of the computer system obtained through the lease. From the debtor's viewpoint, these two agreements were undoubtedly "wedded" to each other. However, based on published authority from the Ninth Circuit Court of Appeals, this court finds that the two agreements must be viewed as separate contracts for purposes of § 365 of the Bankruptcy Code.

In *Pacific Express, Inc. v. Teknekron Infoswitch Corporation (In re Pacific Express, Inc.)*, 780 F.2d 1482 (9th Cir.1986), the facts are analogous to the matter presently before this court. Teknekron, a creditor, agreed to deliver to the debtor, Pacific Express, Inc., certain telecommunications equipment in exchange for monthly installment payments over a five year period. This agreement was reduced to a document entitled "lease agreement." At approximately the same time, Pacific and Teknekron entered into a Maintenance Agreement in which Teknekron agreed to service the telecommunications equipment for a monthly fee. Approximately four months later, a separate and distinct transaction was negotiated whereby Teknekron sold certain other telecommunications equipment to Pacific. When Pacific filed a Chapter 11 bankruptcy case approximately four months thereafter, Teknekron filed a motion for relief from the automatic stay so that it could regain possession of the leased equipment, as well as, the equipment which it had sold to the debtor. As alternative relief, Teknekron asked that Pacific either assume or reject what Teknekron claimed to be an executory contract composed of the equipment lease, the maintenance agreement, and a software license.

The parties agreed and the court concurred that the lease agreement and maintenance agreement were part of a single transaction. However, the court found that for purposes of § 365 of the Bankruptcy Code, the lease agreement and the maintenance agreement had to be construed as two separate and distinct contracts. The court then concluded that the lease agreement was, in fact, an installment sales transaction, and that Teknekron had failed to perfect its security interest. The bankruptcy court also ordered Pacific to either assume or reject the maintenance agreement which was found to be an executory contract. In its opinion, the Ninth Circuit observed as follows:

> Implicit in [the original bankruptcy] order is the assumption that the Maintenance Agreement and software license could be considered separately as constituting an executory contract. We believe that the Maintenance Agreement

and software license are sufficiently separate from the Lease Agreement, as to not make an executory contract out of what was essentially a completed installment sale of the Original Equipment accompanied by a security agreement. The maintenance obligation, while involving future performance by Teknekron, was an appendage to the already performed installment sale and security agreement. As such, the Maintenance Agreement did not suffice to make the entire agreement executory, but properly may be regarded as a separate transaction for purposes of § 365.

*Id.* at 1488.

This court concurs. Although the SSA and the equipment lease entered into by Bell & Howell and the debtor may be viewed as component parts of the same transaction, they are, in fact, separate and distinct agreements insofar as § 365 of the Bankruptcy Code is concerned.

## IV.

■■■ Turning first to the computer equipment lease, the court must determine whether the transaction was a true lease or an installment sales transaction. The validity of a creditor's claim is determined by applying state, or non-bankruptcy law. *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). In reviewing the equipment lease, the court found the following choice of law provision at Paragraph 15:

This Agreement shall be governed and subject to the internal laws (exclusive of the Conflicts of Law provisions) and decisions of the courts of the state of Illinois. The parties consent to the jurisdiction of any local, state, or federal court located within Cook County, Illinois and waive any objection relating to improper venue or forum non conveniens. Whenever possible, each provision of this agreement shall be interpreted in such manner as to be effective and valid under applicable law and if any provision of this agreement is held illegal, invalid or void, so that the provision may be changed to the extent reasonably necessary to make the provision, as so changed, legal, valid, and binding. In any event, the remaining provisions of this agreement shall not be affected or impaired and, to that end, the provisions of this agreement shall be severable.

The Uniform Commercial Code, at § 1–105(1), provides that the parties may by agreement specify the jurisdiction whose law is to govern a transaction which is otherwise encompassed by the Uniform Commercial Code. Both Mississippi and Illinois have adopted the pertinent provisions of § 1–105 of the Uniform Commercial Code.[1] Accordingly, this court will apply Illinois law in its examination of the equipment lease.

Illinois adopted Article 2A of the U.C.C. effective January 1, 1992. *See,* 18 ILCS 5/2A–101 (formerly Ill.Rev.Stat. ch 26, par 2A–101). Article 2A, which provides rules governing the leasing of personal property, was promulgated in response to the increased popularity of such financial arrangements in the market place. However, Article 2A does not apply to agreements which are labeled as a "lease," but which are, in fact, secured sales transactions. In conjunction with the adoption of Article 2A, the Illinois Legislature also adopted the new Uniform Commercial Code definition of "security

---

1. Although not applicable in the present matter, the Mississippi version of § 1–105 varies from the model code in that it provides that the law of the State of Mississippi shall always apply to any dispute regarding implied warranties regardless of any agreement by the parties. *See* § 75–1–105, Miss.Code Ann. (1972).

interest" which simplifies the court's task in determining whether a transaction is a lease or a secured installment sale. For reference purposes, the relevant portion of the amended definition of "security interest" is set forth as follows:

> (37) "Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation.
>
> . . . .
>
> (b) Whether a transaction creates a lease or security interest is determined by the facts of each case; however, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, and
>
> (i) the original term of the lease is equal to or greater than the remaining economic life of the goods,
>
> (ii) The lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods,
>
> (iii) The lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement, or
>
> (iv) The lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

810 Ill. Comp. Stat. Ann. 5/1–201(37) (2000).

■ Under the revised definition of "security interest," the primary focus is on the economic realities of the transaction rather than the intent of the parties. In *Banterra Bank v. Subway Equipment Leasing Corporation (In re Taylor)*, 209 B.R. 482 (Bankr.S.D.Ill., 1997), the Illinois definition of "security interest" was applied by a bankruptcy court which found as follows:

> Under this approach, the lease will be construed as a security interest as a matter of law if the debtor cannot terminate the lease and one of the enumerated requirements [i.e., § 1–201(37)(b)(i), (ii), (iii), or (iv)] is satisfied. (citation omitted) If the court determines that the transaction is not a disguised security agreement per se, it must then look at the specific facts of the case to determine whether the "economics of the transaction" suggest such a result.

*Id.* at 484–485.

In applying the new definition of security interest to the lease agreement attached to the Bell & Howell proof of claim, the court first notes that the following language is found on the face of the document in bold type: "This lease is non-cancelable." In addition, the agreement includes a heading denominated as "Purchase Options:" Beneath this heading three purchase options are provided. The first is "$1.00 Buy out," and the second is "Fair Market Value." The third option is merely a blank, which, presumably, allows flexibility for the parties to create a mutually agreeable amount. On the subject equipment lease, the "$1.00 Buy out" option was selected.

It is undisputed that the debtor herein had possession and control of the computer equipment up to the time that the agreed order terminating the automatic stay was entered. This factor, coupled with the clear language of the lease agreement, which provides that it is non-cancelable and that the lessee has the option to become the owner of the equipment for the nominal consideration of $1.00, leads this court to the inescapable conclusion that

the lease agreement is, in fact, an installment sales transaction.

The aforementioned finding should come as no surprise to Bell & Howell. Indeed, paragraph 6 of the lease, entitled "Title to Equipment; Security Agreement;" provides that if the transaction is determined to be a lease intended as a security agreement, the lessee grants to the lessor a prior and unsubordinated security interest in the equipment and any proceeds thereof. Furthermore, Bell & Howell took the added precaution of perfecting its putative security interest by filing UCC–1 financing statements at the local and state level. Accordingly, the court also concludes that the "lease" suffices as a "de facto" security agreement, and that the collateral rights granted to Bell & Howell were properly perfected by the filing of the financing statements. As such, Bell & Howell is a secured creditor insofar as the computer equipment is concerned.

■ Secured transactions are governed by Article 9 of the Uniform Commercial Code. Specifically, § 9–504 regulates the rights and duties of a secured party in disposing of collateral after default. The secured creditor is required to conduct a commercially reasonable sale of the collateral with the proceeds to be applied to the outstanding debt. The debtor is then liable for the deficiency as an unsecured debt. Obviously, the failure of the secured creditor to maximize the proceeds of the sale of the collateral significantly impacts the debtor by proportionally raising the amount of the deficiency.

In the matter presently before the court, the debtor alleges that Bell & Howell has released the computer equipment, but has failed to credit or offset its claim against the debtor. Bell & Howell asserts that despite its attempts to mitigate, it was unable to sell or re-let the equipment. Attached as Exhibit E to Bell & Howell's

rebuttal memorandum is the affidavit of Joseph J. Taylor, general counsel for Bell & Howell. He indicates that the property leased to the debtor under the equipment lease, as well as, the SSA will have to be scrapped because Bell & Howell has been unable to locate a buyer or subsequent lessee for it. He concludes that the property has no residual value.

■ Despite the contentions, set forth in the Taylor affidavit, the court notes that the original equipment lease includes a $3,000.00 reduction on the purchase price for "trade-in," presumably for equipment traded to Bell & Howell by the debtor. This is indicative to the court that used computer equipment does have some residual value. In addition, paragraph 5 of the affidavit of Bell & Howell's attorney, Barbara L. Young, attached as Exhibit E to her original memorandum, contains a statement that she drafted the stipulation and agreed order modifying the automatic stay "for the limited purpose of insuring that [Bell & Howell] could recover the equipment leased to the debtor under the lease." The act of expending time and effort to obtain an order to gain recovery of the collateral indicates that Bell & Howell must have assigned at least a nominal value to it. On the other hand, if repossessed collateral is worthless, a creditor makes a commercially reasonable disposition of the collateral by scrapping it. *General Electric Capital Corporation v. Vashi,* 480 N.W.2d 880, 18 UCCRS 2d 988 (Iowa, 1992).

The only proof before the court concerning the value of the equipment as of the date it was surrendered is through the Taylor affidavit. The debtor disagrees with these conclusions. Accordingly, in order to appropriately calculate the unsecured deficiency, the court finds that an evidentiary hearing must be conducted to determine the value of the computer

equipment as of the date that the automatic stay was lifted.

## V.

■ The second contract is the SSA, entered into by the parties on December 20, 1996. In this agreement, Bell & Howell agreed to provide certain hardware, software, and a database, as well as, continuing equipment and software support services in exchange for 60 monthly installment payments. As with the equipment lease, the SSA contains a choice of law provision. Paragraph 18 states as follows:

> GOVERNING LAW: This agreement shall be governed by and construed in accordance with the laws of the state of Ohio and/or, Illinois. The places of jurisdiction for all disputes arising from or in connection with this agreement shall be Cleveland, Ohio, and/or Chicago, Illinois, and customer hereby submits to personal jurisdiction in Cleveland, Ohio, and/or Chicago, Illinois. If any provision of this agreement is invalid or unenforceable for any reason, the remainder of this agreement shall not be affected thereby.

In determining whether the SSA is a lease, an executory contract, or an installment sales transaction, the court turns again to 810 Ill. Comp. Stat. Ann. 5/1–201(37)(2000). In examining the SSA, the court notes that it contains a provision that it is non-cancelable. However, none of the remaining factors, which would indicate that the agreement is an installment sales contract, are evident. Significantly, the SSA does not provide a purchase option for a nominal consideration at the end of the agreement's term. The form of the agreement is entirely different from the equipment lease. There is no language in the SSA granting a security interest in the hardware, software, or database, and there are apparently no UCC–1 financing statements on file. Although the hardware, software, and database were originally delivered to the debtor at the inception of the SSA, the terms of the agreement provide that these items will be periodically replaced with upgrades by Bell & Howell. The SSA also incorporates a continuing duty on the part of Bell & Howell to provide maintenance and support services during the entire 60 month term of the agreement. Accordingly, the court finds that the SSA is neither a lease nor an installment sales transaction.

The debtor does not dispute that it had made only 27 of the scheduled 60 monthly installment payments as of the date of the Chapter 11 filing. In addition, the debtor does not dispute that Bell & Howell remained ready and able to perform all of its remaining obligations under the SSA.

■ Although not defined in the Bankruptcy Code, an agreement is an "executory contract" within the Fifth Circuit, "if at the time of the bankruptcy filing, the failure of either party to complete the performance would constitute a material breach of the contract thereby excusing the performance of the other party." *In re Murexco Petroleum, Inc.*, 15 F.3d 60, 62–63 (5th Cir.1994), *quoted in Stewart Title Guaranty Company v. Old Republic National Title Insurance Co.*, 83 F.3d 735, 741 (5th Cir.1996).[2] As such, the court concludes that the SSA is an executory contract.

Executory contracts are treated in a bankruptcy case pursuant to § 365 of the Bankruptcy Code. The trustee or debtor-in-possession may either assume or reject

---

**2.** *See generally,* Countryman, Executory Contracts in Bankruptcy, 57 MINN. L. REV. 439 (1973).

the contract. A succinct explanation of the two options and the consequences flowing therefrom were addressed by the Bankruptcy Court for the Western District of Texas as follows:

> The Bankruptcy Code expressly provides a structure for processing executory contracts in 11 U.S.C. § 365. Under § 365, the trustee may assume or reject an executory contract on behalf of the estate; the decision to assume or reject is effective upon confirmation of a plan. If the executory contract is rejected, the act of rejection is deemed to equal a breach of the contract occurring the day prior to the filing of the bankruptcy petition, and the non-debtor is given a pre-petition claim for damages arising from such a breach, measured (in the usual case) by the terms of the contract and applicable state (or federal) law. 11 U.S.C. § 502(g). *See Matter of Continental Airlines,* 981 F.2d 1450–51; *NLRB v. Bildisco and Bildisco,* 465 U.S. 513, 531, 104 S.Ct. 1188, 1199, 79 L.Ed.2d 482 (1984). If, on the other hand, the estate elects to assume the executory contract, then it takes on the burdens associated with that contract, agreeing to cure any outstanding defaults, and committing to perform on a going-forward basis. If the estate, following assumption, fails to perform, then the non-debtor party to the contract will hold a claim against the estate which enjoys administrative priority. *See* 11 U.S.C. §§ 365(g)(2)(A), 503(b), and 507(a)(1). Thus, in the usual circumstance, the non-debtor party to the contract will hold either a pre-petition unsecured claim (in the event of rejection) or a post-petition administrative priority claim (in the event of assumption).

*In re El Paso Refinery, LP,* 220 B.R. 37, 40–41, (Bankr.W.D.Tex.1998).

■ This court agrees that the rejection of an executory contract constitutes a breach of the contract as of the day before the filing of the bankruptcy case. This in turn gives the non-debtor party a pre-petition "claim" in the bankruptcy case for breach of contract damages. The "basic federal rule" in bankruptcy is that state law governs the substance of claims. *Raleigh v. Illinois Department of Revenue,* 530 U.S. 15, 120 S.Ct. 1951–1954, 147 L.Ed.2d 13 (2000) *quoting Butner v. United States,* 440 U.S. 48, 57, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). *See also, Grogan v. Garner,* 498 U.S. 279, 283, 111 S.Ct. 654, 657, 112 L.Ed.2d 755 (1991).

As noted previously by the court, the SSA contains a choice of law provision which provides that either Ohio or Illinois law shall apply. Because the court previously applied Illinois law to the computer equipment lease, Illinois law will be considered in order to calculate the amount of damages due Bell & Howell resulting from the debtor's breach of the SSA. However, before doing so, the court must address the debtor's argument that the SSA was terminated, rather than merely rejected, post-petition.

### VI.

■ In its brief, the debtor asserts that the order entered on July 1, 1999, effectively terminated the equipment lease and the SSA, thereby absolving both parties from any further obligations due under either agreement. The debtor argues that Bell & Howell lost any right to assert a claim for rejection damages once the termination occurred.

Three circuits, including the Fifth Circuit, have held that the mere rejection of an executory contract pursuant to § 365 of the Bankruptcy Code does not constitute a "termination" of the contract. *In re Austin Development Company,* 19 F.3d 1077,

1081 (5th Cir.1994). *Citing, In re Continental Airlines,* 981 F.2d 1450, 1459 (5th Cir.1993) ("To assert that a contract effectively does not exist as of the date of rejection is inconsistent with deeming the same contract breached.") *See also, In re Modern Textile, Inc.,* 900 F.2d 1184, 1191 (8th Cir.1990); *Leasing Service Corporation v. First Tennessee Bank,* 826 F.2d 434, 436—37 (6th Cir.1987). Section 365 of the Bankruptcy Code is not a substantive avoidance power; rather, it allows a debtor in possession to reject or breach an executory contract and establishes the measure of damages attendant thereto.

There are circumstances, however, where an executory contract may be terminated post-petition and both parties are relieved from further obligations thereunder. In *In re Public Service Company of New Hampshire,* 884 F.2d 11, 14–15 (1st Cir.1989), the non-debtor party to an executory contract was found to have no claim against the estate once the debtor had not assumed or rejected the contract, and the non-debtor had not employed the remedies made available by § 365(b)(2) to force the debtor to make either election.

The Bankruptcy Court for the Western District of Texas also concluded that § 365 is the exclusive remedy available to a non-debtor to establish damages following the rejection of an executory contract. Judge Leif M. Clark held that the non-debtor party to an executory contract is required to continue post-petition performance under the contract at least until the debtor makes an election to either assume or reject. He noted that the non-debtor party could request a termination of the contract either directly or through a motion to lift the automatic stay, but, significantly, such tactics would eliminate any claim for breach of the contract that the non-debtor would ordinarily have against the estate.

*See, In re El Paso Refinery, L.P.,* 220 B.R. 37, 44–47 (Bankr.W.D.Tex.1998).

The court reviewed closely the order entered on July 1, 1999, in order to determine if the SSA was terminated post-petition by the parties. The court made a finding earlier in this opinion that the equipment lease was an installment sales transaction. As such, it was not an executory contract or an unexpired lease capable of being assumed or rejected. Therefore, any language in the July 1, 1999, order purporting to "terminate" or "reject" the equipment lease is legally inapplicable to this part of the proceeding. However, the following language of the order, relating to the SSA, is informative:

E. The debtor is hereby authorized to reject the SSA [Subscription Services Agreement] effective immediately upon the bankruptcy court's entry of this stipulation and agreed order.

F. Nothing in this Order shall affect, limit or impair any unsecured, secured or administrative expense claims that BHFSC [Bell & Howell] may have against the debtor's estate.

The unambiguous language of this order provides that the SSA was rejected, not terminated. The final paragraph specifically provides that nothing in the order shall impair Bell & Howell's right to assert a claim against the estate.

Based on the foregoing analysis, the court concludes that the SSA was rejected, not terminated, and that Bell & Howell has a legitimate claim for rejection damages under § 365 against the debtor's estate.

## VII.

In calculating the amount of the Bell & Howell claim, the court must determine what damages are available for breach of contract under Illinois law. "In

any breach of contract case, the proper measure of damages is the amount that will place the non-breaching party in as satisfactory a position as it would have been had the contract been fully performed." *Med + Plus Neck and Back Pain Center, S.C. v. Noffsinger,* 311 Ill. App.3d 853, 244 Ill.Dec. 712, 726 N.E.2d 687, 691 (2000). "The purpose of damages is to put the non-breaching party into the position he or she would have been in had the contract been performed, but not in a better position." *Walker v. Ridgeview Construction Co., Inc.,* 316 Ill.App.3d 592, 249 Ill.Dec. 746, 736 N.E.2d 1184, 1187 (2000).

Under Illinois law, Bell & Howell is entitled to damages in an amount equal to the sum of the payments it would have received under the SSA, less the costs that would be attributed to its own performance. As of the day before the filing of the bankruptcy petition, thirty three monthly payments remained due in the total amount of $30,414.00. The terms of the SSA also provide that the debtor would be responsible for any late charges and taxes due or assessed. This would include late charges of $45.25, and sales tax in the amount of $2,128.98, as indicated on the proof of claim. This total would be reduced by the calculated costs that would reasonably be expended by Bell & Howell in performing its obligations under the SSA. The court cannot ignore the obvious fact that Bell & Howell's fulfillment of its responsibilities is not "free of charge."

 Illinois also applies the concept of mitigation of damages to breach of contract actions. "A party injured by breach of contract is required to use all reasonable means to minimize his damages." *Harmon Insurance Agency, Inc. v. Thorson,* 226 Ill.App.3d 1050, 169 Ill.Dec. 1, 590 N.E.2d 920, 922 (1992). Although Illinois courts do not label the responsibility of an injured party to mitigate damages as being a "duty" in the legal sense, the courts are not hesitant to reduce compensation if the injured party fails to make a reasonable effort to mitigate damages. *Wired Music v. D.M. Clark,* 26 Ill.App.2d 413, 168 N.E.2d 736 (1960) (Illinois law does not assess damages against an individual for the failure to mitigate in a breach of contract action, but fails to compensate him for injury which could have been avoided.); *Fruehauf Trailer Company v. Lydick,* 325 Ill.App. 28, 59 N.E.2d 551 (1945) (Where an injured party in a breach of contract action could have avoided additional loss by the exercise of reasonable care and failed to do so, the measure of damages will be reduced by a sum equal to the damages which could have been avoided.)

In the affidavit of Joseph J. Taylor, which was mentioned hereinabove, Bell & Howell asserts that it attempted to mitigate damages flowing from the breach of the SSA, but was unable to locate a buyer or subsequent lessee for the property or services. The debtor refutes this assertion. Accordingly, an evidentiary hearing must be scheduled to determine if Bell & Howell made a reasonable effort to mitigate its damages, as well as, to determine the costs to Bell & Howell to perform its obligations under the contract.

 Regarding the addition of attorney's fees and costs in the amount of $1,705.19, the court notes the following language which appears at paragraph 8.5 of the SSA: "Customer shall pay or reimburse B & H for all reasonable costs and expenses, including reasonable legal fees, incurred or paid by B & H in protecting or enforcing rights or remedies hereunder." Under Illinois law, attorney's fees are recoverable when specifically authorized by statute or contract. *Mirar Development, Inc. v. Kroner,* 308 Ill.App.3d 483, 241 Ill.Dec. 815, 720 N.E.2d 270, 273 (1999).

The court has reviewed the itemization of fees and expenses, which were attached to the proof of claim, and finds that the fees and costs are reasonable. Accordingly, the sum of $1,705.19, representing fees of $1,561.50, and expenses of $143.69, shall be included in the final calculation of damages.

An order will be entered accordingly.