In re BUEHNE FARMS, INC., Debtor.

No. 04–32052.

United States Bankruptcy Court,
S.D. Illinois.

Jan. 26, 2005.

Law Office of Terry Sharp, P.C., Mt. Vernon, IL, for Movants.

James Richard Myers, LeFevre Oldfield Myers Apke & Payne Law Group, Ltd., Vandalia, IL, for Defendant.

*OPINION*

KENNETH J. MEYERS, Chief Judge.

This dispute arose when Ag Lease or Loan, L.L.C. [sic] (hereafter, Ag) and its assignees, U.S. Bank, as successor in interest to Firstar Bank, and Hillcrest Bank (hereafter collectively, "movants") moved to compel the debtor to assume or reject two agreements that movants characterize as leases. The debtor opposed that characterization, arguing that the agreements are disguised security agreements. Based on the arguments raised and the evidence before the Court, the Court finds that the agreements are disguised sales.

The debtor entered into two nearly identical agreements for the acquisition of dairy cattle. On September 14, 2001, the debtor entered into an agreement with Ag for the acquisition of 122 head of dairy cows. (Ex. 1) ( hereafter, Agreement 1.)[1] This agreement provides for a fifty-month term, with two monthly "rental" payments of $6,640.00 each, due in advance beginning October 1, 2001, followed by two monthly "rental" payments of $100.00 each, and concluding with forty-six monthly "rental" payments of $6,640.00 each. Agreement 1 includes a purchase option,

---

**1.** Ag assigned its interest in Agreement 1 to Firstar Bank on September 29, 2001. (Ex. 3.) U.S. Bank, a party to this dispute, is the successor in interest to Firstar Bank.

allowing the debtor to purchase the cows for $20,000.00 upon expiration of the agreement, assuming no breach or earlier termination of the Agreement has occurred. As will be discussed in further detail below, Agreement 1 contains a "Residual Guaranty" in the amount of $20,000.00.

On October 19, 2001, the debtor entered into a second agreement with Ag for the acquisition of 90 head of dairy cows. (Ex. 6) (hereafter, Agreement 2.)[2] This agreement provides for a fifty-month term, with two monthly "rental" payments of $4,791.76 each, due in advance beginning October 25, 2001, followed by two monthly "rental" payments of $100.00 each, and concluding with forty-six monthly "rental" payments of $4,791.76 each. Agreement 2 includes a purchase option, allowing the debtor to purchase the cows for $14,433.00 upon expiration of the agreement, assuming no breach or earlier termination of the Agreement has occurred. As will be discussed in further detail below, Agreement 2 contains a "Residual Guaranty" in the amount of $14,433.00.

With the exception of the terms set forth above, the two agreements are identical. Under each agreement, the debtor obtained cows from third party suppliers and the movants provided the financing. Each agreement permits the movants to perfect a security interest in the subject cows, replacement cows and female offspring, and the movants did file financing statements to perfect their interests in the cows. (Exs. 4, 9.) Each agreement is denominated a "Dairy Cattle Lease," with Ag as the "lessor" and the debtor as the "lessee," and each provides for monthly "rental" payments as set forth above. Each agreement states that it may not be cancelled or terminated by the debtor. Each provides that the movants retain "[a]ll right, title and interest" in the cows and in their female offspring born during the term of the agreement. The debtor is prohibited from selling or disposing of any cow without prior written consent from the movants. If any cow must be replaced because of death, injury or another cause, the debtor is required, at its expense, to replace the cow with a cow of like kind and value as the original cow. The replacement cow is to be the property of the movants and is subject to all terms of the agreement.[3] At the expiration of the fifty-month term, assuming no earlier breach or termination has occurred, the debtor may exercise the purchase option available under each agreement. In the event the debtor does not exercise the purchase option, the debtor is to return all cows subject to the agreement to the movants at the conclusion of the term of the agreement. Each agreement requires the debtor to provide insurance, to pay all taxes, to provide feed and other upkeep, to pay for medical treatment, and to bear all risk of loss or injury to the cows. In addition, each agreement contains the following "Residual Guaranty":

> Lessee guarantees to Lessor that the net sales proceeds from the sale of the cows (as defined in the Lease) at the end of the lease term shall be $[ ][4] (the "Guaranteed Residual Value").

> Lessor shall use its best efforts to sell the cows within sixty (60) days of the

---

**2.** Ag assigned its interest in Agreement 2 to Hillcrest Bank on October 19, 2001. (Ex. 8.)

**3.** Under the agreements, the female calves and the replacement cows become the property of the movants and are subject to all terms of the agreements.

**4.** Agreement 1 uses the amount of $20,000.00, while Agreement 2 uses the amount of $14,433.00 as the "Guaranteed Residual Value."

termination of the Lease. The sale may be on any terms so long as Lessor acts in good faith and in a commercially-reasonable manner, but so long as Lessor so acts, it shall be conclusively presumed that the sales price is the fair market value of the cows and that the failure to realize the Guaranteed Residual Value is due to excessive use of the cows or other cause, not anticipated when the Lease was signed, and entitling Lessor to additional rental. If the net sales proceeds received by Lessor are less than the Guaranteed Residual Value described above, Lessee agrees to pay Lessor in cash, the difference within thirty (30) days after the date of sale.

The Court scheduled a hearing on the movants' motion to compel the assumption or rejection of the agreements, at which time the movants offered the agreements into evidence. No party sought to produce testimony at the hearing. Subsequently, the Court gave the parties two opportunities to brief the issues involved in their dispute and to submit evidence to support their positions. No party has requested a further hearing. From the limited evidence presented, the Court finds that the productive milking life of a dairy cow varies depending upon herd management, (Cooke Aff. ¶ 7), and may range from 36 months, (Cooke Aff. ¶ 12), to 60 months, (Sharp Aff. ¶ 3(a) (citing 2004 exam testimony of Gervase and Norma Buehne)), with 48 months being the typical period for the debtors' herd. (Buehne Aff. filed November 8, 2004 ¶ ¶ 5–6.) The average dairy farmer replaces twenty to thirty percent of a dairy herd annually. (Cooke Aff. ¶ 8.) When a dairy cow ceases to produce adequate milk to make continued milking economically feasible, if the cow cannot be rehabilitated through medical treatment, it is sold within a week and slaughtered within a few days after the sale. (Buehne Aff. filed December 27, 2004 ¶ ¶ 5, 6, 8, 10.) A cow is typically sold at the expiration of forty-eight months for $600.00 to $800.00, with the price dependent upon the market, the cow's condition and its age. (Buehne Aff. filed November 8, 2004 ¶ 7.)

The existence, nature and extent of a security interest in property is decided by reference to state law. *E.g., In re Powers,* 983 F.2d 88, 90 (7th Cir.1993). The criteria for determining whether a transaction is a "true lease" or a disguised security agreement are set forth in § 1–201(37) of Illinois' Uniform Commercial Code.[5] 810 ILCS 5/1–201(37). Under that section, the intent of parties is subordinated to the "economic realities" of the transaction, *e.g., In re Taylor,* 209 B.R. 482, 484 (Bankr.S.D.Ill.1997), with the analysis focusing on the presence or absence of certain enumerated factors. Under this approach, despite the presence of an agreement purported to be a lease, a security agreement is conclusively found to exist if the lessee cannot terminate the lease and any one of four enumerated factors is satisfied. *Id.* at 484. Known as the *per se* test, this portion of § 1–201(37) provides:

> Whether a transaction creates a lease or security interest is determined by the facts of each case; however, a transac-

**5.** Each agreement provides that it will be construed under the laws of the State of Kansas. However, no party has invoked these provisions nor cited Kansas law as controlling. Due to the adoption of the Uniform Commercial Code in both Illinois and Kansas, the Court finds there to be no difference in the statutes addressing whether the agreements are "true leases," *compare* 810 ILCS 5/1–201(37) *with* Kan. Stat. Ann. § 84–1–201(37), and declines to perform a choice of law analysis. *See, e.g., Powers,* 983 F.2d at 90 n. 3; *Agricultural Management Development, Inc. v. National City Bank,* No. 1:02–CV–11, 2003 WL 21919184, at * 16 n. 22 (N.D.Ind. June 23, 2003).

tion creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee; and

(a) the original term of the lease is equal to or greater than the remaining economic life of the goods;

(b) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;

(c) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement; **or**

(d) the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

810 ILCS 5/1–201(37) (emphasis added).

■ If an agreement is found to be a security agreement as a matter of law under the *per se* test, the Court's inquiry is over. *See, e.g., Taylor,* 209 B.R. at 484–85. However, if it is determined that a transaction is not a disguised security agreement *per se,* the Court must then examine the facts particular to the case to determine whether the "economics of the transaction" point to such a result. *Id.*

■ The burden of proving whether the agreements are disguised security agreements or true leases rests with the party who would lose if no evidence were presented. *See, e.g., Auburndale State Bank v. Dairy Farm Leasing Corp.,* 890 F.2d 888, 893 (7th Cir.1989). Notwithstanding a presumption placing the burden on the party who claims that what purports to be a lease is actually not, *see, e.g., In re Pillowtex, Inc.,* 349 F.3d 711, 716 & n. 6 (3d Cir.2003), if that presumption is overcome, then the burden shifts to the opposing side to refute the evidence that the transaction is a disguised sale. *See, e.g., Auburndale,* 890 F.2d at 893–94.

■ It is necessary to point out here that both sides of this dispute have been remiss in their presentations to the Court. Neither party adequately provided evidence that would assist the Court in its assessment, and the debtor failed to provide any case authority whatsoever to support its arguments. The movants, while providing a general review of case authority, failed to a great extent to relate that authority to the specific facts of this case. In addition, the movants principally raised arguments about the debtor's economic shortcomings and defaults that occurred subsequent to entering into the agreements. Such matters are irrelevant to the Court's understanding of the parties true intention to enter into a lease or a sale, which must be measured at the outset of the transactions, rather than by circumstances occurring later. *See, e.g.,* 4 J. White & R. Summers, *Uniform Commercial Code* § 30–3 at 19–20, 29, 32 (5th ed.2002).

The debtor in this case has presented three arguments. In the first two, it contends that the agreements are disguised sales *per se,* either because the consideration required to exercise the purchase options is nominal, or because the terms of the agreements consume the remaining economic life of the cows.[6] The debtor's third argument claims that, because the movants have perfected security interests in the cows and are seeking relief from the

---

**6.** The debtor has not relied upon subsections (b) and (c) of § 1–201(37), and the Court agrees that these subsections are inapplicable given the facts of this case.

automatic stay to enforce these security interests, they are foreclosed from arguing that the agreements are true leases.

In responding to the nominality question, the movants argue that the additional consideration under the contracts is not nominal based on the predicted fair market value of the cows as reflected in the amounts of the purchase option and of the "Residual Guaranty" contained in each agreement. Movants suggest as well that a reversal of the "economic realities" test requires an examination of not only whether the debtor would want to purchase at the option price but whether it is likely to have the financial resources to do so and whether any sensible person would **sell** cows to an "unsuccessful, insolvent dairy farmer who could not pay for them ... no matter how low the option price...." Finally, movants argue that the admittedly "low" purchase options are not evidence of concealed sales but rather "reward[s]" for successful performance under the agreements. However, movants contend, since the debtor has defaulted under the agreements, it may not exercise the purchase options in any event.

With respect to the question of whether the terms of the agreements consume the useful economic life of the cows, the movants respond that the economic life of the "young" cows extends beyond the terms of the agreements and that there is a meaningful reversionary interest at the conclusion of the agreements. The movants have not addressed the issue of whether they are precluded from arguing that the agreements are leases due to their perfecting security interests in the cows and seeking relief from the automatic stay pursuant to those security interests.

In determining whether the transactions are security interests under the *per se* test, the Court initially notes that all parties agree that the agreements may not be terminated by the debtor, thus establishing the first prong of the test. For the second prong, the Court turns to the nominality issue. The debtor argues here that the agreements are conclusively security interests because the consideration to be paid to exercise the purchase option contained in each agreement, computed per head, is nominal when compared to the price for which the cows may be sold for slaughter at the conclusion of the fifty-month terms. Completing the calculations urged by the debtor, the Court finds that each of the 122 cows subject to Agreement 1 may be purchased for the sum of $163.93 if the $20,000.00 purchase option is exercised. Similarly, each of the 90 cows subject to Agreement 2 may be purchased for $160.37 if the $14,433.00 purchase option under that agreement is exercised. The debtor urges the Court to contrast these per head option prices with the $600.00 to $800.00 fair market value that each cow may bring at the end of forty-eight months as a dairy cow, resulting in a purchase option under both agreements that ranges from twenty to twenty-seven percent of the sale price depending upon the ultimate market price obtained. However, the debtor has provided the Court with no case law or other authority to suggest that this is the appropriate comparison and the Court's own research reveals that it is not.

■ Although the inclusion of an option to purchase in a lease does not alone make the lease a disguised security arrangement, where the lessee can become the owner of the goods for only nominal consideration at the end of the lease, the transaction is considered to be a sale in substance. *Orix Credit Alliance, Inc. v. Pappas*, 946 F.2d 1258, 1261 (7th Cir.1991) (citing *In re Marhoefer Packing Co., Inc.*, 674 F.2d 1139, 1142 (7th Cir.1982)). Unfortunately, no "bright line" test exists for evaluating if consideration is nominal.

*E.g., Taylor,* 209 B.R. at 486. A method for judging what constitutes "nominal consideration" was announced by this Circuit in the *Marhoefer* case where the Court held:

> [I]n determining whether an option price is nominal, the proper figure to compare it with is not the actual fair market value of the leased goods at the time the option arises, but their fair market value at that time **as anticipated by the parties when the lease is signed**.

*Marhoefer,* 674 F.2d at 1144–45 (emphasis added). *See also Orix,* 946 F.2d at 1262 (citing *Marhoefer* for the proposition that "[a]n option price may . . . be found to be nominal where it is insubstantial in relation to the fair market value of the leased goods at the time the option arises as anticipated by the parties when the agreement was executed"). However, the Court is unable to make the analysis called for in *Marhoefer* because the parties have provided no evidence of the fair market value they predicted the cows would have at the conclusion of the agreements. Although movants argue that the purchase options and the residual guaranty clauses constitute evidence of predicted fair market value, the Court cannot make that assumption without further proof that this was the parties' intent. *See, e.g., Orix,* 946 F.2d at 1262 & n. 4 (court unable to assume that either the option prices or the amounts of the residual guarantees represented the parties' estimation of what the fair market value of the collateral would be at the conclusion of the lease). In fact, the language of the residual guaranty clauses suggests that the parties contemplated these figures to be minimum sales prices

rather than predictions of fair market value.[7]

Apart from the *Marhoefer* test, this Circuit has recognized other formulas to be of help in determining nominality. *Orix,* 946 F.2d at 1261. Some courts have compared the option price to the original cost of the leased goods. *Id.* at 1262; *Taylor,* 209 B.R. at 486. This comparison may not be made in the instant case, however, because the Court has been presented with no evidence of the original purchase price of the cows. Other courts have compared the option price to the total rental price of the leased goods. *See, e.g., Orix,* 946 F.2d at 1261. Using this formula, the option price of $20,000 in Agreement 1 constitutes approximately 6 percent of the total rentals of $318,920.00. The option price of $14,433.00 in Agreement 2 represents approximately 6 percent of the total rentals of $230,204.48.

■ Section 1–201(37)(x) of Illinois' Uniform Commercial Code strives to delineate whether an option price is nominal. It provides, in pertinent part, that additional consideration is nominal if "it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised." 810 ILCS 5/1–201(37)(x). This section codifies what is traditionally known as the "economic realities" test by focusing on whether the lessee has, given all the facts and circumstances, no reasonable alternative but to exercise the purchase option. *See Taylor,* 209 B.R. at 486. In other words, if only a fool would fail to exercise the option, the option price is considered nominal and the transaction revealed to be a disguised sale. *Id.; see also* 4 J. White & R. Summers, *supra,* § 30–3 at 18. Under this test, it is

---

**7.** Residual guarantees, in which the lessee promises to make up a shortfall if the leased goods fail to realize a minimum sale price, are considered mechanisms to protect lessors from unusual wear and tear to their goods during the term of the lease. *See, e.g., In re Otasco, Inc.,* 196 B.R. 554, 559–60 (N.D.Okla. 1991).

obvious that an option price constituting merely six percent of the total rentals is so economically compelling that the debtor would be foolish to forego its exercise. The lack of a rational alternative is made more evident still by reviewing the contractual payment schedule. After completion of fifty monthly payments totaling $318,920.00 for Agreement 1 and $230,204.48 for Agreement 2, no reasonable lessee would cede the cows if they could be purchased for a payment equivalent to only three months' rent. This is underscored by the facts that the parties bargained for the replacement of any cows removed from the herd **at the debtor's expense** and that female calves born during the fifty-month term become subject to the agreements. Accepting movants' contention that twenty to thirty percent of the herd is replaced annually, the debtor would have a large expenditure for naught, and would lose the benefit of all female births, if it failed to exercise the purchase options.

■ Although the movants urge the Court to reverse the "economic realities" test by exploring the unreasonableness of selling (as opposed to leasing) cows to a financially unsound farmer, the Court finds no merit in this argument. There are no facts of record suggesting that the debtor was financially unstable at the inception of the agreements.[8] Moreover, even if such facts existed, they would not sustain a conclusion that leasing cows to a financially troubled farmer would be a sounder business practice than financing their sale. The Court finds similar cause to discount the movants' contention that the admittedly "low" option prices were rewards for successful performance under the agree-

ments rather than evidence of disguised sales. While the Court appreciates the novelty of this argument, it is not supported by any evidence of the parties' intent or by authority of any kind and, therefore, must be rejected. In addition, the Court rejects the movants' argument that the debtor's breaches of the agreements, causing contractual forfeitures of the purchase options, have bearing on whether the agreements are leases or disguised sales. The character of the agreements is determined by the facts as they exist at the time the agreements were executed and not by the course of events subsequent to that time. *See, e.g.,* 4 J. White & R. Summers, *supra,* § 30–3 at 19–20, 29, 32.

■ Having found that the debtor may not terminate the agreements and that the consideration required to purchase the cows is nominal, the Court finds that the agreements are secured sales *per se.* Given this finding, the Court need not address any of the other arguments of the parties. The Court notes, however, the existence of other signposts indicating that the agreements are disguised sales. Under the agreements, the debtor bears all costs of insurance, taxes, upkeep and veterinary care for the cows, as well as the risk of loss if the cows are injured or die. *See, e.g., Taylor,* 209 B.R. at 487–88. In addition, the debtor was required to pay advance rent of $13,280.00 under Agreement 1, and of $9,583.52 under Agreement 2. *See, e.g., Orix,* 946 F.2d at 1262 (requirement of a down payment held to be a factor indicating a secured sale). Moreover, movants did not own the cows when they agreed to "lease" them to the debtor. Instead, the cows were supplied by third

---

**8.** In their brief filed December 29, 2004, the movants explain that 2004 examination testimony supporting this claim is attached to the brief. However, none of the excerpts of the 2004 examination testimony attached to the brief relate to the financial condition of the debtor at the time the agreements were executed.

parties, suggesting that movants were simply financing a sale. *Id.* at 1263. These indicia of a disguised sale are not offset by the presence of language in the agreements providing that movants retain "[a]ll right, title and interest" in the cows. The appearance of such language in a purported lease has been held not determinative of whether the "lessee" is acquiring equity in the "leased" property. *Id.*

For the reasons stated, the Court finds that the agreements are disguised sales and that the motion to compel the debtor to assume or reject the agreements should be denied.