**In re Keith and Karrie BAILEY, Debtors.**

No. 6:04–BK–73199M.

United States Bankruptcy Court,
W.D. Arkansas,
Hot Springs Division.

May 10, 2005.

David D. Coop, Chapter 13 Trustee.

Thomas W. Byarlay, Little Rock, AR, for debtors.

### ORDER

JAMES G. MIXON, Bankruptcy Judge.

On May 7, 2004, Keith and Karrie Bailey ("Debtors"), filed a voluntary petition for relief under the provisions of chapter 13 of the United States Bankruptcy Code. On November 16, 2004, Lafayette Investments, Inc. ("Lafayette") filed an objection to confirmation as well as several other pleadings.[1] These matters were considered at a hearing held in Hot Springs, Arkansas, on December 15, 2004, and were taken under advisement. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), and this Court has jurisdiction to enter a final judgment in the case.

Lafayette objects to confirmation on the single ground that it is not a secured creditor, but rather the lessor of two pieces of equipment pursuant to valid leases and that the Debtors must treat its claim in accordance with 11 U.S.C. § 365 as an unexpired lease.

The Debtors' first plan was filed on May 7, 2004, and it treated Lafayette's two claims as secured, one in the amount of $22,300.00 secured by collateral valued at $18,000.00 and the other in the amount of $20,800.00 secured by collateral valued at $18,000.00. The 60–month plan proposed identical payments for each claim in the amount of $357.00 per month with interest accruing at the rate of 7% per annum. The plan further proposed that Lafayette retain its lien and be paid over the life of the plan the value of its collateral or the amount of its claim, whichever is less. The notice of the first meeting set the date for objecting to confirmation at ten days after the conclusion of the 341(a) meeting.

The meeting of creditors was held and concluded on June 15, 2004, and Lafayette did not file an objection to the plan pro-

---

1. Lafayette's other motions were a Motion to Dismiss, Motion for Adequate Protection, Motion to Assume or Reject Lease, and Motion for Relief from Stay. Lafayette's Motion for Adequate Protection was granted by the Court at the conclusion of the hearing on the Objection to Confirmation. The Motion to Assume or Reject Lease is subsumed in the Objection to Confirmation. The Motion to Dismiss was not argued in the brief; therefore, the motion is considered to be abandoned.

posed on May 7, 2004, by the deadline, although objections by other creditors were filed and sustained.

The Debtors filed a second amended plan on September 27, 2004 and a third plan dated October 22, 2004, neither of which changed the treatment of Lafayette's claims. The notice of the third modified plan provides that creditors have 25 days from October 22, 2004, to object to the modified plan. On November 16, 2004, Lafayette filed, for the first time, an objection to confirmation of the plan originally filed on May 7, 2004. However, the Debtors make no objection as to the timeliness of Lafayette's objections.

## FACTS

The testimony introduced at trial conflicts with some of the documentary evidence. Lafayette called Donald E. Fritsche ("Fritsche") as a witness. On behalf of Lafayette, Fritsche negotiated the leases of two 2000–model Freightliner over-the-road tractors with Keith Bailey (hereinafter "Debtor"). The lease payments for the two units are $828.00 and $773.00 per month. He stated that Lafayette received a down payment of $2200.00 on the first unit and $3700.00 on the second unit when the leases were executed. (Tr. at 10.) Fritsche testified that the Debtor has made no regular monthly payment on either unit. The leases were executed April 5, 2004, and the Debtor filed a petition for relief under the provisions of chapter 13 on May 7, 2004.

Fritsche testified that the Debtor had an option to purchase the units for an amount equal to 10% of the tractors' fair market value, determined as of the time of the commencement of the leases, less the down payments. (Tr. at 14.) Title to the units remained in the name of Lafayette until the purchase option was exercised. Mid–Am Financial, the bank that financed the transaction, holds a lien in each title, which is evidenced on the face of the titles. The monthly payments the Debtor makes to Lafayette under the leases are equal in amount to the payments Lafayette owes Mid–Am Financial.

According to Fritsche, Lafayette's profit under each lease is the down payment and the 10% buy-out at the end of the lease. (Tr. at 16.) In the event of default, Fritsche stated Lafayette would be entitled to repossess the units and re-lease them, but that the Debtor still owes the balance of the lease payments unless Lafayette can mitigate its damages by releasing the units. The Debtor also pays the license fees and the expense of the insurance and repair. Fritsche stated he was unaware of any personal property tax due on the units. He stated the units should be worth approximately $14,000.00 to $15,000.00 at the end of the lease term. When asked why he would trade this value for a small purchase price at the end of the lease, he stated, "Because I get the down payment and the 10% at the end and ... that's the program that we use." (Tr. at 18.)

The Debtor testified that he thought he was purchasing, not leasing, the units in question. (Tr. at 29.) He stated that he pays personal property taxes on the vehicles.

Exhibit "A" to Creditor's Exhibit 1 is a document styled "Equipment Lease." The lease is an eleven-page document in small print.[2] The document purports to be a true lease. With some exceptions, the lease generally agrees with Fritsche's explanation of the lease terms in his testimony.

---

**2.** The lease was apparently a form used in other jurisdictions; paragraph 3.4 refers to Washington State Business and Occupations Tax.

The lease has a provision defining "projected residual value" (Creditor's Ex. 1, Ex. "A" at ¶ 1.30) and a definition of "net sales proceeds," defined as a sum computed as the then fair market value minus lessor's expenses in obtaining possession and selling the equipment at fair market value (Creditor's Ex. 1, Ex. "A" at ¶ 1.25). The lease contains a provision detailing how the parties will arrive at the "residual value." This provision provides the following:

"Section 3.17 **Residual Value.** The parties estimate that the Actual Residual Value of the Equipment at expiration of the Term of this lease will be equal to the Projected Residual Value set forth in Schedule 1 hereto. If the Actual Residual Value of the Equipment at expiration of the Term of this Lease exceeds or is less than the Projected Residual Value, the total amount of the rent payable hereunder shall be adjusted accordingly. Within ten (10) days following the final determination of the Actual Residual Value of the Equipment, if the amount thereof exceeds the Projected Residual Value, the difference shall be paid by the Lessor to the Lessee. Conversely, if the Actual Residual Value is less than the Projected Residual Value, the difference shall be paid by the Lessee to the Lessor within said ten (10) day period."

(Creditor's Ex. 1, Ex. A at ¶ 3.17.)

Despite this language, the written lease does not contain an option to purchase and specifically states that the transaction is a true lease and that the lessee has no option to purchase. (Creditor's Ex. 1, Ex. 1 at ¶ 4.13.) Significantly, the subsection also provides that in the event the document is not construed as a lease by a court of competent jurisdiction, the Lessor shall have a security interest in the equipment. The agreement provides that the law of Missouri shall govern and the testimony of Fritsche was that the lease was executed in Bates City, Missouri.

Debtors' Exhibit No. 1 included a document entitled "Addendum to Equipment Lease Lafayette Investments, Inc. d/b/a Mid Am Truck Center Lease/Purchase Agreement Acceptance Certificate." The addendum stated the following:

I Keith Bailey agree to all terms and conditions of the lease purchase contract. I also understand that at [sic], for any reason during my term of the lease, if I feel that it is necessary to bring the vehicle back, the following conditions will apply:

1. The vehicle will be in road-worthy condition, including the engine, transmission, rear ends, tires in D.O.T. quality, and all other specs that Lafayette Investments, Inc. deems necessary for resale of the truck.

2. Account on lease must be in current condition.

3. Ninety days (3 months) of payments must be submitted at the time of turn-in to ensure the quality of the truck and for time and hardship it creates Mid Am Truck Center.

4. Commencement and Expiration Dates.

The Commencement Date of the Term of this Lease was April 1, 2004, and the expiration date thereof will be April 1, 2007.

(Debtor's Ex. 1.)

The addendum had other documents attached to it, including a form styled "Uniform Sales & Use Tax Certificate" indicating that Lafayette was the seller and the Debtor, Keith Bailey, was the buyer. The Addendum itself referred to the transaction as a "Lease/Purchase Agreement." (Debtors' Exhibit 1.) The lease was as-

signed to Mid–Am Financial as collateral for the loan to Lafayette. Debtor's Exhibit 2 is a payment and amortization schedule evidencing a loan at 20% interest per annum from Lafayette to the Debtor of $20,800.00 for 36 months with total principal payments of $20,800.00 and total interest payments of $7,028.09. Similar lease documents were submitted by Lafayette as Creditor's Exhibit 2 and pertained to the second tractor lease, except that no payment and amortization schedule was presented as evidence with regard to the second lease.

## DISCUSSION

If the transaction is construed as a sale of personal property and is secured by a perfected security interest in the property, the Debtor must propose to treat Lafayette's claim as provided in section 1325(a)(4) and (5) of the Bankruptcy Code. If the transaction is a true lease and the Debtor desires to keep the property, then the Debtor must assume the lease, cure all defaults, and perform the lease according to its terms in compliance with sections 1322(b)(7) and 365 of the Bankruptcy Code. *In re Sellers*, 26 U.C.C. Rep. Serv.2d 42 (Bankr.N.D.Ala.1994); *In re Taylor*, 130 B.R. 849, 853 (Bankr.E.D.Ark. 1991) (citing 11 U.S.C. § 365(b)(1); *In re Urbanco, Inc.*, 122 B.R. 513 (Bankr. W.D.Mich.1991); *In re Wallace*, 122 B.R. 222 (Bankr.D.N.J.1990)).

■ To determine whether an agreement represents a sale or a lease, the bankruptcy court must look to applicable state law. *In re Architectural Millwork, Inc.*, 226 B.R. 551, 553 (Bankr.W.D.Va. 1998) (citing *In re Yarbrough*, 211 B.R. 654, 656 (Bankr.W.D.Tenn.1997); *In re Nat'l Traveler*, 110 B.R. 619, 620 (Bankr. M.D.Ga.1990)). The parties agree that Missouri law governs the issue of whether this agreement is a sale or a lease.

The briefs filed by the parties are generally unhelpful. Lafayette argues the point that no purchase option exists in the lease, but ignores the testimony to the contrary by its own witness and by the Debtor. None of the testimony about the purchase option was objected to by Lafayette, although this testimony would seem to raise an issue of the applicability of the parol evidence rule under Missouri law because it conflicted with the written provisions of the contract. *See* Mo. Ann. Stat. § 400.2A–202 (West 1994) (found in statute governing leases, this provision states that the terms of a writing intended to be a final expression of an agreement may not be contradicted by any prior agreement or contemporaneous oral agreement but may be explained or supplemented by evidence of consistent additional terms); Mo. Ann. Stat § 400.2–202 (West 1994) (same parol evidence provision but applicable to sales). No argument is made in Lafayette's brief on the applicability of the parol evidence rule.[3]

The Debtors' brief suffers from the same neglect. While agreeing that Missouri law governs, the Debtors cite a 1991 opinion of the Arkansas Attorney General, a 1986 Eighth Circuit Court of Appeals

---

**3.** Parol evidence is admissible to supplement existing terms. In this case, there would be no reason to have a clause in the agreement setting forth a procedure for determining residual value if no purchase option existed. Also, the addendum to the agreement appears to allow the lessee to "bring the vehicle back" with some restrictions that contradict other written provisions of the agreement and Fritsche's testimony. *See In re Kim*, 232 B.R. 324, 330 (Bankr.E.D.Pa.1999) (where lease had integration clause and stated no option to purchase should be implied, but ancillary agreement offered lessee purchase option for nominal sum at end of lease, court must look to entire transaction to determine the true nature of the agreement).

case and two older cases from the Missouri Supreme Court and Court of Appeals that construe the applicable Missouri statute before its revision in 1992. The Debtor does not cite any decision of the Bankruptcy Court in Missouri even though there are several reported cases. The Debtor also makes no mention in his brief that both parties to the transaction testified that an option to purchase existed.

The applicable law is a Missouri statute that mirrors the current version of Section 1–201(37) of the Uniform Commercial Code. The revision of U.C.C. Section 1–201(37) shifts the focus away from the intent of the parties and toward the economic realities of the transaction. *In re Yarbrough,* 211 B.R. 654 (Bankr.W.D.Tenn.1997)(citing U.C.C. § 1–201(37), cmt.; Laura J. Paglia, Note, *U.C.C. Article 2A: Dstinguishing Between True Leases and Secured Sales,* 63 St. John's L.Rev. 69, 75–76 (1988)).

Missouri's version of the applicable Uniform Commercial Code section provides in pertinent part as follows:

Whether a transaction creates a lease or security interest is determined by the facts of each case; however, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, and

(a) the original term of the lease is equal to or greater than the remaining economic life of the goods,

(b) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods,

(c) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consid-

eration upon compliance with the lease agreement, or

(d) the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

A transaction does not create a security interest merely because it provides that:

(a) the present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into,

(b) the lessee assumes risk of loss of the goods, or agrees to pay taxes, insurance, filing, recording, or registration fees, or service or maintenance costs with respect to the goods,

(c) the lessee has an option to renew the lease or to become the owner of the goods,

(d) the lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed, or

(e) the lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is performed.

For the purposes of subsection (37):

(a) Additional consideration is not nominal if (i) when the option to renew the lease is granted to the lessee the rent is stated to be the fair market rent for the use of the goods for the term of the renewal determined at the time the option is to be performed, or (ii) when the

option to become the owner of the goods is granted to the lessee the price is stated to be the fair market value of the goods determined at the time the option is to be performed. Additional consideration is nominal if it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised;

. . .

Mo. Ann. Stat. § 400.1–201(37)(West 1994).[4]

In 2001, the late Judge Frank Koger of the Bankruptcy Court for the Western District of Missouri decided the issue of whether, under Missouri law as amended in 1992, an agreement was a true lease or security for a conditional sales contract. *See In re Hoskins,* 266 B.R. 154 (Bankr. W.D.Mo.2001). The court first noted that the term "security interest" is defined in section 400.1–201(37) of the Missouri Uniform Commercial Code and in 1992 was amended to take its present form as set out above.

Observing that no Missouri appellate, bankruptcy or Eighth Circuit case had addressed the issue of true lease versus security interest in the context of the amended version of section 400.1–201(37), the court looked for guidance to cases from other jurisdictions with identical U.C.C. provisions. From its examination of those cases, the court developed an analytical framework under the statute.

▬ The court must first ask whether the debtor has a right to terminate the purported lease prior to expiration of its term. *Hoskins,* 266 B.R. at 160. A provision in a contract requiring the lessee to remain financially liable to the lessor for payments that become due after the termination date does not constitute the right to terminate under the statute. *Hoskins,* 266 B.R. at 160. If the debtor does not have a right to terminate, the court then examines whether any of the four enumerated conditions have been satisfied. *See Mo.* Ann. Stat. § 400.1–201(37)(a)–(d) *supra.* If so, the parties have entered into a security agreement as a matter of law. *Hoskins,* 266 B.R. at 160 (quoting *In re Owen,* 221 B.R. 56, 60–61 (Bankr.N.D.N.Y.1998) (describing bright-line test for security interest)).

▬ If there is no right to terminate but also none of the four conditions apply, the court cannot find that, as a matter of law, the contract constitutes a security agreement. However, the analysis does not end here. The court must further examine the specific facts of the case to determine whether, despite failing the bright line test, the "economics of the transaction" still suggest a security interest.

In *Hoskins,* there was no right to terminate; however, none of the four additional conditions was satisfied. Therefore, the contract did not pass the bright-line test of a security interest. The court then proceeded to examine the transaction in light of factors relied upon by courts prior to the 1992 amendment to the extent the factors were consistent with the amended statute. Among the relevant factors in *Hoskins* were the facts that the lessee was

---

4. This statute amended the definition of security interest that was the law in Missouri until 1992. The former statute provided in pertinent part: "(37) . . . Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or nominal consideration does make the lease one intended for security." Mo. St. 400.1–201(37)(West 1991).

not under an absolute obligation to purchase the leased property and that the purchase option was not for a nominal sum. These two factors further supported Judge Koger's conclusion that the transaction was a true lease.

■ Applying this framework to the instant case, the Court finds that because the Debtor does not have a legal right to cease payments and walk away from the lease without liability for the deficiency, the Debtor does not have a right to terminate under the purported lease. According to the Addendum to each lease, the Debtor is liable for three months' lease payments if he chooses to "bring back" the equipment. Lafayette's witness testified that if the Debtor terminates the lease, he is responsible for the remaining lease payments unless Lafayette is successful in releasing the equipment. Under either condition, the Debtor remains financially liable to the lessor for payments that become due after the termination date.

■ The next step is to determine whether any of the four enumerated conditions listed in the statute apply. The Court finds that the fourth condition is applicable: the lessee has an option to become the owner of the goods for nominal additional consideration upon compliance with the lease agreement. In discussing nominal value, a leading treatise on the Uniform Commercial Code has stated that nominal value is determined by examining the parties' prediction, at the time of the contract, of the concluding value of the goods. The test is whether "the option price is so low that the lessee will certainly exercise it and will, in all plausible circumstances, leave no meaningful reversion for the lessor." James J. White & Robert S. Summers, 4 Uniform Commercial Code § 30–3 at 33 (5th ed.2002).

The question of whether an option price is nominal was recently discussed by the Bankruptcy Court for the Southern District of Illinois. The court stated:

> Section 1–201(37)(x) of Illinois' Uniform Commercial Code strives to delineate whether an option price is nominal. It provides, in pertinent part, that additional consideration is nominal if "it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised." *810 ILCS 5/1–201(37)(x)*. This section codifies what is traditionally known as the "economic realities" test by focusing on whether the lessee has, given all the facts and circumstances, no reasonable alternative but to exercise the purchase option. See *[In re] Taylor*, 209 B.R. [482] at 486 [(Bankr.S.D.Ill. 1997)]. In other words, if only a fool would fail to exercise the option, the option price is considered nominal and the transaction revealed to be a disguised sale. *Id.;* see also 4 J. White & R. Summers, *supra*, § 30–3 at 18. Under this test, it is obvious that an option price constituting merely six percent of the total rentals is so economically compelling that the debtor would be foolish to forego its exercise. The lack of a rational alternative is made more evident still by reviewing the contractual payment schedule. After completion of fifty monthly payments totaling $318,920.00 for Agreement 1 and $230,204.48 for Agreement 2, no reasonable lessee would cede the cows if they could be purchased for a payment equivalent to only three months' rent.

*In re Buehne Farms, Inc.*, 321 B.R. 239, 245–46 (Bankr.S.D.Ill.2005).

For examples of transactions determined to have been sales for security rather than leases under the revised 1–201(37) provision of the Uniform Commercial Code, see *In re Our Secret, Ltd.*, 282 B.R. 697, 704 (Bankr.D.N.M.2002) (Debtor-les-

see could not terminate lease and had purchase option for nominal consideration); *HPSC, Inc. v. Wakefield (In re Wakefield)*, 217 B.R. 967, 970–71 (Bankr.M.D.Ga.1998)(transaction was disguised sale because not subject to termination by lessee and option price was nominal); *Hanes v. Vital Prod. Co. (In re Vital Prod. Co.)*, 210 B.R. 109, 112 (Bankr. N.D.Ohio 1997) (rent payments were not terminable by lessee and lessee had option to purchase for nominal amount at end of lease term).

Even though there is no contractual obligation to exercise the option to purchase in this case, the Debtor has no other reasonable alternative. Lafayette's witness testified that at the expiration of the lease the tractors will be worth $15,000.00 each and he will sell them to the Debtor for their projected residual value of approximately $2230.00 and $2080.00. The purchase option in this case is 13% or 14% of what Lafayette estimates the fair market value will be when the lease expires. If the Debtor fails to exercise the option, the Debtor will lose approximately $12,920.00 to $12,770.00 in equipment value (the estimated fair market value less the purchase price) for each tractor. If he does purchase the equipment, he pays only $2200.00 and $2080.00, much less than he will lose if the option is not exercised. Therefore, the additional consideration is nominal because it is less than the Debtor's reasonably predictable cost of performing under the lease but not exercising the option.

Because the Debtor may not terminate the agreements and the consideration to purchase is nominal, the transactions between the Debtor and Lafayette are sales for security and not leases as a matter of law. Additionally, the Court observes that this transaction is characterized by numerous other factors relied upon by other courts to support the conclusion that the transaction was a sale and not a true lease. The court in *In re Buehne Farms* detailed some of these additional factors:

> Having found that the debtor may not terminate the agreements and that the consideration required to purchase the cows is nominal, the Court finds that the agreements are secured sales *per se*. Given this finding, the Court need not address any of the other arguments of the parties. The Court notes, however, the existence of other signposts indicating that the agreements are disguised sales. Under the agreements, the debtor bears all costs of insurance, taxes, upkeep and veterinary care for the cows, as well as the risk of loss if the cows are injured or die. *See, e.g., Taylor*, 209 B.R. at 487–88. In addition, the debtor was required to pay advance rent of $13,280.00 under Agreement 1, and of $9,583.52 under Agreement 2. *See, e.g., Orix [Credit Alliance, Inc. v. Pappas]*, 946 F.2d [1258] at 1262 [(7th Cir.1991)] (requirement of a down payment held to be a factor indicating a secured sale). Moreover, movants did not own the cows when they agreed to "lease" them to the debtor. Instead, the cows were supplied by third parties, suggesting that movants were simply financing a sale. *Id.* at 1263. These indicia of a disguised sale are not offset by the presence of language in the agreements providing that movants retain "[a]ll right, title and interest" in the cows. The appearance of such language in a purported lease has been held not determinative of whether the "lessee" is acquiring equity in the "leased" property. *Id.*

*In re Buehne Farms, Inc.*, 321 B.R. at 246–47.

In the instant case, signposts indicative of a sale include the facts that the Debtor bears the risk of loss, must pay applicable

taxes, must maintain insurance with Lafayette as loss payee, is responsible for maintenance and repair of the property, and was required to make a down payment on each piece of equipment before the lease commenced. Furthermore, the Debtor was furnished an amortization schedule that refers to the transaction as a loan and breaks the rent payments into principal and interest.

Also present here is the fact that Lafayette purchased the units and financed them with Mid–Am Financial, paying note payments exactly equal to the lease payments owed by the Debtor to Lafayette. According to Lafayette's own witness, its profits were not derived from the monthly payments but instead from the down payment and the purchase option price. Additionally, the written agreement provided that Lafayette was granted a security interest in the event the transaction was regarded as a sale. (However, there was no evidence that the security interest had been perfected).

## CONCLUSION

For the reasons stated, the Court finds that under Missouri law the agreement between Lafayette and the Debtor was a sale for security and the objection to confirmation is overruled, the motion to assume or reject the unexpired lease is denied, and the motion for relief from stay is denied. The motion to dismiss is also denied because it was apparently abandoned by Lafayette.

IT IS SO ORDERED.