DRAIN, District Judge,
dissenting.
In this case, I respectfully disagree with the majority’s decision on the application *522 of the facts to the tests to be applied. I would affirm the bankruptcy court’s decision finding that the transactions involved in this case were disguised security agreements as opposed to true leases.
A. Bright-Line Test
I agree with the bankruptcy court, and find In re Buehne Farms instructive. That case involved a dairy farmer/debtor who argued his fifty-month cattle leases were disguised as security agreements when his lessors motioned the bankruptcy court to extend the time for the debtor to assume or reject fifty month cattle leases. In re Buehne, 321 B.R. 239 at 240. The debtor obtained his cattle via two leases with third party buyers. Id. at 241. The Buehne Farms leases are almost identical to Purdy’s leases. Id. The In re Buehne court found that the average dairy farmer culls at an annual rate of twenty to thirty percent and the debtor’s cows had a forty-eight month economic life. Id. at 242. The In re Buehne Farms court found the economic life of a dairy cow could range from thirty-six to sixty months. Id.
Sunshine argues this case is distinguishable because the leases Purdy signed did not have purchase options. Although this is true, I find this case is instructive because it offers guidance on the economic life of dairy cows given a farmer’s culling practices.
We review the bankruptcy court findings of fact under the clear-error standard. B-Line, LLC v. Wingerter (In re Wingerter), 594 F.3d 931, 935-36 (6th Cir.2010) (citing Behlke v. Eisen (In re Behlke), 358 F.3d 429, 433 (6th Cir.2004)). Under this standard, the reviewing court must ask whether the bankruptcy court’s factual findings were erroneous.
The bankruptcy court in this case heard similar testimony about cull rates and the practices on the Purdy farm. Id. at 537. The bankruptcy court determined that Purdy had a thirty percent cull rate. Id. at 533. This rate causes nearly complete herd turnover after thirty-six months. I agree with the bankruptcy court’s determination that the individual heads of cattle are the good at issue. Each head of cattle was a means of production rather than part of a unit. For Purdy, each cow was a sophisticated piece of equipment that produced a product; milk. The economic life of the individual heads of cattle would not last the term of the lease. Any cows on Purdy’s farm at the end of the lease term would not be the original cows because he would have culled those cows from the herd. In fact, Purdy would have culled nearly all of the cattle from Lease 1 at the time of the petition. Thus, the agreements were for a period longer than the cows’ economic value to Purdy. The lease and Sunshine’s testimony speak to total herd maintenance over the lease term, but this was not important to the parties. The parties did not follow these provisions of the lease. This finding was within the economic life range used by the In re Beuhne Farms court who heard similar testimony regarding culling practices. I find no error in the bankruptcy court’s factual finding of a thirty month culling rate. Therefore, I do not agree with the majority. Unlike the majority, I would hold the Bright-Line Test is met and the leases were per se security agreements.
B. Economic Realities of the Transaction
The majority finds that the leases fail the Bright-Line test. A lease agreement can fail the Bright-Line test, which is inevitable when the herd is the relevant good, and the court can still find that an agree *523 ment creates a security interest.[1] See A.R.S. § 47-1203(A); In re Phoenix Equip., Co., Inc., 2009 WL 3188684 at *10 (stating the facts of a case can determine whether a lease is a security agreement). It is my view that the economics of the transactions do not support a finding that the parties entered into lease agreements, and Citizens bore the burden of establishing the documents were not what they purported to be.
The UCC and its Arizona adaptation offer very little guidance to courts on how to analyze the economics of a transaction. A common factor courts use is whether the lessor has a reversionary interest in the leased goods or an option to purchase. Id. Courts are not limited to these factors. In re WorldCom, Inc., 339 B.R. 56, 72 (Bankr.S.D.N.Y.2006). In fact, by limiting itself to these factors, the court conducts a similar analysis to the Bight-Line test. In re Phoenix Equip. Co., Inc., 2009 WL 3188684 at *10 (holding parties course of dealings was a relevant factor in determining whether leases were security interests). Courts should focus on other relevant facts at the time of the agreements. Id.
In re Phoenix Equipment Co. Inc. is distinguishable from this matter because it also involves a purchase option. Id. at *11. The In re Phoenix Equip. Co., Inc. leases did not provide for an option in the language of the lease, but the court inferred the option by analyzing the parties’ course of dealings. Id. When the parties could not establish whether the purchase price on the option was nominal, the In re Phoenix Equipment Co., Inc. court focused on the structure and effect of the parties’ transactions. Id. (stating the court must consider the agreements within the context of the parties’ relationship). The debtor needed capital in order to run his operation and entered into transactions in which he transferred title of equipment to his creditor in exchange for the capital. Id. The court concluded the nature of the transactions showed that the debtor did not need a lease agreement, but needed capital to continue operating. Id. at *12.
In the three relevant leases, third parties sold cattle to Purdy. Sunshine reimbursed Purdy for the cost of the cattle. Sunshine knew Purdy did not adhere to the replacement cattle provisions in its agreements, but chose to ignore his noncompliance. Sunshine was aware of Citizens’ lien at the time it entered into the transactions and filed its statements. The facts of the case at the time of the transaction indicate that Purdy needed money to place cows on the farm. Sunshine, by the way it forwarded funds to Purdy, appears to have supplied Purdy with funds rather than the actual cattle. Sunshine received a lien on the cattle whose acquisition it financed. These facts indicate the parties entered into three financing transactions rather than three lease transactions.
Furthermore, the reimbursement sheds doubt on Sunshine’s characterization of the leases as finance leases under Article 2A. Under Arizona’s adaptation of the UCC, finance leases have three characteristics. A.R.S. 47-2A103(A)(7). First, the lessor does not select, manufacture, or supply the goods. Id. at (a). Second, the lessor acquires the goods or a right to possess and use of the goods in connection with the lease. Id. at (b). Purdy selected the cattle, and the cattle were branded in accordance with Exhibit B of the lease, which creates a presumption of ownership. Third, one of three events involving the lessee must occur. Id. at (c). The lessee must, before signing the lease, receive a copy of the contract by which the lessor *524 acquired the goods. Id. Alternatively, lessee approval of the contract by which the lessor acquired the goods can be a condition of the effectiveness of the lease. Id. Last, the lessee, prior to signing the contract, “receives an accurate and complete statement designating the promises and warranties, and any disclaimers of warranties, limitations or modifications of remedies, or liquidated damages, including those of a third party, such as the manufacturer of the goods, provided to the lessor by the person supplying the goods in connection with or as part of the contract by which the lessor acquired the goods or the right to possession and use of the goods[J” Id. It is not clear from the record whether any of these three instances occurred.
Purdy purchased the cattle, and there is no indication in the record Purdy approved or saw a contract or any warranties or promises the third-party buyer would have given to Sunshine. Sunshine only has invoices and bills to indicate it paid for cattle that Purdy already had on his farm. Sunshine has not shown its leases meet the statutory requirements of the finance lease. Thus, the bankruptcy court did not err by relying on the parties’ post lease conduct in reaching its conclusion. Testimony reveals Sunshine acquiesced in Pur-dy’s decision to sell the cattle, and use the funds to either purchase more cattle or deposit the sale proceeds in his Citizens’ account. It was not error for the bankruptcy court to rely on the fact that Purdy acquired the cattle from third parties and Sunshine reimbursed these parties. This arrangement was tantamount to Sunshine financing the acquisition of cattle for Pur-dy’s dairy operation. Moreover, Sunshine failed to come forward with evidence it actually owned the cattle delivered by the third party buyers, which calls into question the leases status as finance leases. I would hold the economics of the transaction support a finding that the parties entered into security agreements for the cattle rather than leases.
For these reasons, I respectfully dissent and would affirm the bankruptcy court’s decision.

. Sunshine argues that the herd is a perpetually self-renewing asset.