RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0186p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

In Re: LEE H. PURDY,

                                        *Debtor.*

_____

SUNSHINE HEIFERS, LLC,

                                        *Appellant,*

     v.

CITIZENS FIRST BANK,

                                        *Appellee.*

No. 13-6412

_____

Appeal from the United States District Court
for the Western District of Kentucky at Bowling Green.
No. 1:13-cv-00049—Joseph H. McKinley, Jr., Chief District Judge.

Decided and Filed:  August 14, 2014

Before:  MOORE and COLE, Circuit Judges; DRAIN, District Judge.[*]

_____

### COUNSEL

**ON BRIEF:**  David A. Warfield, THOMPSON COBURN LLP, St. Louis, Missouri, for Appellant.  Scott A. Bachert, Ashley D. Belcher, HARNED BACHERT & MCGEHEE PSC, Bowling Green, Kentucky, for Appellee.

     MOORE, J., delivered the opinion of the court, in which COLE, J., joined.  DRAIN, D.J. (pp. 11–14), delivered a separate dissenting opinion.

_____

[*]The Honorable Gershwin A. Drain, United States District Judge for the Eastern District of Michigan, sitting by designation.

—————————

**OPINION**

—————————

KAREN NELSON MOORE, Circuit Judge.  Between 2009 and 2012, Sunshine Heifers, LLC ("Sunshine") and Lee H. Purdy, a dairy farmer, entered into several "Dairy Cow Leases." Purdy received a total of 435 cows to milk, and, in exchange, he paid a monthly rent to Sunshine. Unfortunately, Purdy's dairy business faltered in 2012, and he petitioned for bankruptcy protection.  When Purdy filed this petition, Sunshine moved to retake possession of the leased cattle.  Citizens First Bank ("Citizens First"), however, had a perfected purchase money security interest in Purdy's equipment, farm products, and livestock, and it claimed that this perfected security interest gave Citizens First priority over Sunshine with regard to the 435 cattle.  In particular, Citizens First argued that the "leases" between Sunshine and Purdy were disguised security agreements, that Purdy actually owned the cattle, and that the subsequently acquired livestock were covered by the bank's security interest.  The bankruptcy court ruled in favor of Citizens First, finding that the leases were *per se* security agreements.  Given that the terms of agreements expressly preserve Sunshine's ability to recover the cattle, we disagree, **REVERSE** the bankruptcy court's decision, and **REMAND** for further proceedings consistent with this opinion.

## I.  BACKGROUND

Purdy operated his dairy farm in Barren County, Kentucky.  In 2008, he entered into a loan relationship with Citizens First, using his herd of dairy cattle as collateral.  Purdy refinanced his loan on July 3, 2009, executing an "Agricultural Security Agreement" in exchange for additional principal in the amount of $417,570.  R. 20-11 at 1 (2009 Security Agreement) (Page ID #326).  As part of the security agreement, Purdy granted Citizens First a purchase money security interest in "all . . . Equipment, Farm Products, [and] Livestock (including all increase and supplies) . . . currently owned [or] hereafter acquired . . . ."  *Id.*  Three days later, Citizens First perfected this purchase money security interest by filing a financing statement with the Kentucky Secretary of State.  R. 20-12 at 1 (2009 Financing Statement) (Page ID #333).  Purdy and Citizens Bank executed two similar security agreements in August 2010 and May 2012.  *See*

R. 20-13 at 1–7 (2010 Security Agreement) (Page ID #335–41); R. 20-15 at 1–6 (2012 Security Agreement) (Page ID # 343–48).    Citizens First perfected these purchase money security interests as well.  *See* R. 20-14 at 1 (2010 Financing Statement) (Page ID #342); R. 20-16 (2012 Financing Statement) (Page ID #349).

Shortly after refinancing his loan with Citizens First in 2009, Purdy decided to increase the size of his dairy-cattle herd.  He contacted Jeff Blevins of Sunshine regarding the prospect of leasing additional cattle.  Sunshine was amenable to the idea, and on August 7, 2009, Purdy and Sunshine entered into the first of five contracts, three of which are relevant here:  (1) a July 21, 2011 agreement, involving fifty head of cattle; (2) a July 14, 2012 agreement, rolling up two prior agreements and involving 285 head of cattle; and (3) another July 14, 2012 agreement, involving 100 head of cattle.  *See* R. 20-17 (50 Cattle Agreement) (Page ID #351); R. 20-18 (285 Cattle Agreement) (Page ID #369); R. 20-19 (100 Cattle Agreement) (Page ID #386).[1]

Each of these agreements is titled a "Dairy Cow Lease," and under their terms, Purdy received a total of 435 cattle for fifty months in exchange for a monthly rent.  *See, e.g.*, R. 20-17 at 2 (50 Cattle Agreement) (Page ID #351).  The agreements prohibited Purdy from terminating the leases, and Purdy agreed to "return the Cows, at [his] expense, to such place as Sunshine designate[d]" at the end of the lease term.  *Id.* at 2–3 (Page ID #352).  Additionally, Purdy guaranteed "the net sales proceeds from the sale of the Cows . . . at the end of the Lease term [would] be [a set amount between $290 and $300] per head (the 'Guaranteed Residual Value')."  *Id.* at 11 (Page ID #360).  Purdy further promised to maintain insurance on the cattle, to replace any cows that were culled from the herd, and to allow Sunshine the right to inspect the herd.  *Id.* at 3 (Page ID #352).  When the parties signed these contracts, they also executed security agreements, and Sunshine filed financing statements with the Secretary of State.  *See, e.g.*, *id.* at 13–18 (Page ID #362–367).

In the dairy business, farmers must "cull" a portion of their herd every year, replacing older and less productive cows with younger, healthier ones.  Many times, dairy farmers will

---

[1]While the dates on which the "leases" were to commence differ, as do the amounts of the monthly rent and residual guarantee that each agreement requires, the operative terms of the agreements are virtually identical. For the sake of clarity, we refer to the language of the 50 Cattle Agreement—the oldest and best-preserved agreement—in our analysis.

replace the culled cows with their calves. Purdy, in contrast, sold off the calves of Sunshine's cows and purchased more mature replacements.[2] *See In re Purdy*, 490 B.R. 530, 534 (Bankr. W.D. Ky. 2013); R. 21-22 at 29:1–32:19, 73:24–75:16 (Hr'g Tr.) (Page ID #1169–72, 1213–15). This practice contravened the terms of the leases, *see, e.g.*, R. 20-17 at 3 (50 Cattle Agreement) (Page ID #352), but Sunshine was aware of Purdy's behavior and acquiesced in it, *see* R. 21-22 at 74:1–75:16 (Hr'g Tr.) (Page ID #1214–15). Nonetheless, the terms of the lease required Purdy to apply Sunshine's brand and a yellow ear tag to the original cows and their replacements. *See, e.g.*, R. 20-17 at 3 (50 Cattle Agreement) (Page ID #352). In contrast, Purdy applied a white ear tag to the cattle covered by Citizens First's security interest. *In re Purdy*, 490 B.R. at 535. By July 2012, Purdy had approximately 750 head of cattle on his farm. Of those cattle, 435 should have carried Sunshine's brand according to the terms of the leases.

In the fall of 2012, the price of cattle feed rose, and milk production became less profitable. *Id.* at 534. Purdy responded by selling off cattle, including many bearing Sunshine's brand, at a faster rate. Unfortunately, Purdy could not keep his operation above water, and on November 29, 2012, he filed a voluntary petition for Chapter 12 bankruptcy relief, and the bankruptcy court issued an automatic stay, preventing the removal of assets from the farm. *Id.* at 535. A week later, representatives of Citizens First and Sunshine inspected the 389 cattle still on the farm. Of the cows on the property, 289 had white ear tags (indicating that they were covered by Citizens First's security interest) and Sunshine's brand, 99 had only white ear tags, and one cow had neither a tag nor a brand. R. 21-22 at 46:2–14 (Hr'g Tr.) (Page ID #1186). A short time later, another farmer returned forty-three cattle that had been taken in violation of the bankruptcy court's stay. *Id.* at 46:13–20 (Page ID #1186). Sunshine claimed that thirty-nine of those cattle bore Sunshine's brand. *Id.* at 101:7 (Page ID #1241).

Citizens First argued that Purdy owned all of these cattle and, therefore, that they were covered by the bank's perfected purchase money security interest. Sunshine contended that it maintained ownership of the cattle, that Purdy had only a leasehold interest in the cattle, and therefore that the cattle fell outside of Citizen First's security interest. Both Citizens First and

---

[2]The bankruptcy court found that Purdy culled approximately thirty percent of his herd per year. *In re Purdy*, 490 B.R. 530, 534 (Bankr. W.D. Ky. 2013).

Sunshine filed motions in the bankruptcy court for relief from the stay preventing the removal of the livestock.

On January 22, 2013, the bankruptcy court held a hearing on various motions. The dispute between Citizens First and Sunshine turned on whether the leases between Purdy and Sunshine were true leases or disguised security agreements. The bankruptcy court issued its decision on March 1, 2013, finding that

> The original term of the Lease was for 50 months. Clearly, 50 months is longer than the economic life of the goods [the cows]. Uncontradicted testimony indicated that a dairy herd is culled annually at an approximate rate of 30 percent. Within three years an entire herd is extremely likely to have been entirely replaced and certainly before the end of 50 months. Because [Purdy] met this term of the statute, the transaction is a *per se* security agreement and the Court's analysis ends here.

*In re Purdy*, 490 B.R. at 536. Consequently, the bankruptcy court determined that Citizens First's "prior perfected liens attach[ed] to all cows on [Purdy's] farm on the date the Petition was filed," and it denied Sunshine's motion to lift the stay. *Id.* at 540. The bankruptcy court eventually granted Citizens First relief from the stay, however, and the bank foreclosed on the herd. Citizens First auctioned the cattle for $402,353.54, and the bankruptcy trustee awarded these proceeds to Citizens First, which applied them toward Purdy's outstanding debt. *See* Appellant Br. at 9.

Sunshine appealed to the federal district court nine days after the auction sale. R. 1 at 48–55 (Notice of Bankr. Appeal) (Page ID #48–55). Because the cattle had already been auctioned, Sunshine requested a percentage of the sale proceeds equivalent to its share of the cattle sold. Ultimately, the district court affirmed the bankruptcy court's decision on September 25, 2013. R. 54 at 1 (D. Ct. Op.) (Page ID #2287). Sunshine now appeals.

## II. STANDARD OF REVIEW

"When reviewing an order of a bankruptcy court on appeal from a decision of a district court, we review the bankruptcy court's order directly and give no deference to the district court's decision." *Hamilton v. Herr* (*In re Hamilton*), 540 F.3d 367, 371 (6th Cir. 2008). We

review de novo the bankruptcy court's conclusions of law, and we review the bankruptcy court's findings of fact for clear error.  *Id.*

## III.  ANALYSIS

The main question in this case is whether the agreements between Purdy and Sunshine are "true leases" or merely "security agreements."  "'A lease involves payment for the temporary possession, use and enjoyment of goods, with the expectation that the goods will be returned to the owner with some expected residual interest of value remaining at the end of the lease term.'" *In re QDS Components, Inc.*, 292 B.R. 313, 322 (Bankr. S.D. Ohio 2002) (quoting James J. White & Robert S. Summers, *Uniform Commercial Code* § 30-3, vol. 4 (5th ed., West 2002)). "'In contrast, a sale involves an unconditional transfer of absolute title to goods, while a security interest is only an inchoate interest contingent on default and limited to the remaining secured debt.'" *Id.* (quoting White & Summers, *Uniform Commercial Code* § 30-3).  If the agreements are true leases, then Sunshine has a reversionary interest in 435 head of cattle and is entitled to approximately $309,000 from the cattle auction.  *See* Appellant Br. at 35; *see also* 4 James J. White, Robert S. Summers & Robert A. Hillman, *Uniform Commercial Code* § 30-3(a)(1) (6th ed., West 2013) (distinguishing between reversionary interest and security interest).  If the agreements represent the sale of the cattle and Sunshine's retention of a security interest, then Citizens First's perfected agricultural security interest trumps Sunshine's interest, and the bank keeps all of the proceeds from the cattle auction.

In deciding whether these "Dairy Cow Leases" are true leases or disguised security agreements, we look to the relevant state law. *Butner v. United States*, 440 U.S. 48, 54 (1979). The agreements' choice-of-law provisions, in turn, direct us to the laws of Arizona. *See, e.g.*, R. 20-17 at 2 (50 Cattle Agreement) (Page ID #351).

Under Arizona law, "the facts of each case" dictate whether an agreement is a true lease or a security agreement, Ariz. Rev. Stat. § 47-1203(A), and our fact-sensitive analysis proceeds in two steps.  First, we employ the Bright-Line Test.  According to this test, "[a] transaction in the form of a lease creates a security interest if the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee, and . . . [t]he original term of the lease is equal to

or greater than the remaining economic life of the goods." § 47–1203(B).  If the lease runs longer than the economic life of the goods, then the lease is a *per se* security agreement.  *See Duke Energy Royal, LLC v. Pillowtex Corp.* (*In re Pillowtex, Inc.*), 349 F.3d 711, 717 (3d Cir. 2003) (interpreting New York's nearly identical version of the Uniform Commercial Code); *see also Park W. Fin. Corp. v. Phoenix Equip. Co.* (*In re Phoenix Equip. Co.*), No. 2:08-bk-13108-SSC, 2009 WL 3188684, at \*7 (Bankr. D. Ariz. Sept. 30, 2009) (applying the same test to Ariz. Rev. Stat. § 47-1203).  If the goods retain meaningful value after the lease expires, however, we move to the second step and "'look at the specific facts of the case to determine whether the economics of the transaction suggest'" that the arrangement is a lease or a security interest. *Pillowtex*, 349 F.3d at 717 (quoting *In re Taylor*, 209 B.R. 482, 484 (Bankr. S.D. Ill. 1997)); *see also Phoenix Equip.*, 2009 WL 3188684, at \*7 (applying same to Arizona statute).  At all points in this analysis, the party challenging the leases bears the burden of proving that they are something else.  *See Phoenix Equip.*, 2009 WL 3188684, at \*7.

## A.  Bright-Line Test

No one debates that Purdy lacked the ability to terminate the lease.  The question is whether the lease term of fifty months exceeds the economic life of the cattle.  The bankruptcy court fixated upon Purdy's testimony that he culled approximately thirty percent of the cattle each year, meaning that the entire herd would turn over in forty months.  *See In re Purdy*, 490 B.R. at 536.  As a result, the bankruptcy court concluded that the lease term exceeded the economic life of the cattle that Sunshine initially gave Purdy and, therefore, that the lease was a *per se* security agreement.  *Id.*  We disagree and hold that the bankruptcy court erred in its analysis of the cattle's economic life because the court focused upon the economic life of the individual cows originally leased to Purdy, instead of the life of the herd as required by the agreements.

According to the text of the agreements between Purdy and Sunshine, Purdy had a duty to return the same *number* of cattle to Sunshine that he originally leased, not the same cattle.  *See, e.g.*, R. 20-17 at 2 (50 Cattle Agreement) (Page ID #351) ("Lessee hereby leases from Sunshine . . . the number of cows shown above ('the Cows'), each of which is identified by . . . Sunshine's brand and ear tag . . . , whether part of the Lease originally or a replacement."); *id.* at 3 (Page ID

#352); *id.* at 7 (Page ID #356) ("Lessee shall maintain the number of Cows (as defined in the Lease) at all times."). It made little difference to Sunshine whether it received the exact same cows that it originally leased to Purdy; according to Blevins—Sunshine's owner—"the main thing is to maintain the leasehold, the integrity of the lease numbers." R. 21-22 at 107:8–9 (Hr'g Tr.) (Page ID #1247). In line with this understanding, the agreements took into account industry practices, such as culling, by requiring Purdy to replace any unproductive cows that he sold. *See, e.g.*, R. 20-17 at 3 (50 Cattle Agreement) (Page ID #352). Sunshine protected its interest in the herd by inspecting Purdy's operation, *id.*, requiring Purdy to carry insurance, *id.*, and creating a "Residual Guaranty,"[3] which stated that the actual cattle returned would be worth at least a set amount, *id.* at 11 (Page ID #360) (setting a minimum guaranteed price of $290 per head). Given these provisions and the testimony of the parties, it is clear to us that the relevant "good" is the herd of cattle, which has an economic life far greater than the lease term, and not the individual cows originally placed on Purdy's farm. Accordingly, we hold that the contracts flunk the Bright-Line Test and are not *per se* security agreements.

## B. Economics-of-the-Transaction Test

The precise contours of the economics-of-the-transaction test are rather unclear, but courts have largely focused upon two particular factors: (1) whether the lease contains a purchase option price that is nominal; and (2) "whether the lessee develops equity in the property, such that the only economically reasonable option for the lessee is to purchase the goods." *Phoenix Equip.*, 2009 WL 3188684, at *10 (internal quotation marks omitted); *see also QDS Components*, 292 B.R. at 342; *Addison v. Burnett*, 49 Cal. Rptr. 2d 132, 137 (Cal. Ct. App. 1996); 4 White, Summers & Hillman, *Uniform Commercial Code* § 30-3(d). The ultimate question for us, however, is whether Sunshine kept a meaningful reversionary interest in the herd. *See QDS Components*, 292 B.R at 340–41; *Phoenix Equip.*, 2009 WL 3188684, at *10. On the facts presented to us, we hold that Citizens First has also failed to carry its burden of establishing that the actual economics of the transactions indicate that the leases were disguised security agreements.

---

[3]"Residual guarantees, in which the lessee promises to make up a shortfall if the leased goods fail to realize a minimum sale price, are considered mechanisms to protect lessors from unusual wear and tear to their goods during the term of the lease." *In re Buehne Farms, Inc.*, 321 B.R. 239, 245 n.7 (Bankr. S.D. Ill. 2005).

In this case, neither of the above-mentioned factors suggests that these agreements are something other than true leases because the contracts do not contain an option for Purdy to purchase the cattle at any price, let alone at a nominal one. In fact, the agreements explicitly state that Sunshine retains ownership in the cattle throughout the life of the lease and beyond. *See* R. 20-17 at 3 (50 Cattle Agreement) (Page ID #352). This lack of a purchase option distinguishes this case from others, such as *Aoki v. Shepherd Machinery Co. (In re J.A. Thompson & Son, Inc.)*, 665 F.2d 941 (9th Cir. 1982), in which the Ninth Circuit held that a purchase option highly favorable to the lessee converted a lease into a security agreement. *Id.* at 945–46. Here, even if Purdy wanted to purchase the cattle at $300 per cow, there is nothing in the agreements that obligates Sunshine to sell to him. Sunshine could have retaken possession of its cows and leased them out to Purdy's competitor under the same terms, and there would have been nothing Purdy could have done under the agreement. In our view, this state of play is consistent with a lease.

Additionally, the fact that there is no purchase option also distinguishes this case from *In re Buehne Farms, Inc.*, 321 B.R. 239 (Bankr. S.D. Ill. 2005), which the bankruptcy court relied upon heavily. In that case, the court was swayed by the fact that the purported leases allowed the lessee to purchase the cattle at the end of the lease for approximately $160 per cow. *Id.* at 244. The court noted that the lessee had spent approximately $500,000 in rental payments over the life of the lease and that spending just six percent of that would give the lessee title to the cows. *Id.* at 246. Considering that the lessee had spent significant money to replace culled cattle already, the *Buehne Farms* court reasoned that the lessee would be irrational not to exercise the purchase option. *Id.* This situation indicated that the "rental payments" were actually installment payments and that the "purchase option" was really a cleverly disguised final payment. In stark contrast, Purdy's rental payments were just that—payments per a lease. Purdy had no legal right to purchase Sunshine's herd; there was no purchase option that he could exercise. Under the terms of the agreements, Purdy had to return the same number of cows that he originally leased in fair condition as indicated by the Residual Guaranty. At approximately $300 per cow, this herd had a minimum value of $130,500. It sold at auction for approximately $309,000. *See*

Appellant Br. at 35.  Ownership of this herd—in our view—is a significant asset, and thus, we hold that Sunshine retained a meaningful reversionary interest.[4]

Finally, whether the parties adhered to the terms of these leases in all facets, in our view, is irrelevant to determining whether the agreements were true leases or disguised security agreements.  Neither the bankruptcy court nor the parties have sufficiently explained the legal import of Purdy's culling practices or put forward any evidence that the parties altered the terms of the leases making them anything but what they proclaim to be.  Moreover, Arizona Revised Statutes § 47-1203(C) clearly states that the fact that terms of the lease are unfavorable to the lessee, that the lessee assumes the risk of loss of the goods, or that the lease requires the lessee to maintain insurance on the goods is not alone grounds to find that a contract is a security agreement.  As a result, we hold that Citizens First has not carried its burden of proving that the actual economics of the transaction demonstrate that the leases were security agreements.

## IV.  CONCLUSION

For the foregoing reasons, we conclude that Citizens First has failed to demonstrate that the "Dairy Cow Leases" were actually security agreements in disguise.  Because the bankruptcy court found to the contrary, we **REVERSE** and **REMAND** to the bankruptcy court for further proceedings consistent with this opinion.

---

[4]The dissent claims that the record is too thin to hold that the agreements are finance leases under Arizona Revised Statutes § 47-2A103(A)(7).  This may be so, but this void in the record is largely irrelevant to our analysis. Citizens First bears the initial burden of proving that the leases are not what they claim to be. *WorldCom, Inc. v. Gen. Elec. Global Asset Mgmt. Servs.* (*In re WorldCom, Inc.*), 339 B.R. 56, 62 (Bankr. S.D.N.Y. 2006).  It has not carried that burden; the bankruptcy court found that it did.  Therefore, we reverse.  Whether the "Dairy Cow Leases" are actually finance leases is a question for another day.

———————————

**DISSENT**

———————————


DRAIN, District Judge, dissenting.   In this case, I respectfully disagree with the majority's decision on the application of the facts to the tests to be applied.  I would affirm the bankruptcy court's decision finding that the transactions involved in this case were disguised security agreements as opposed to true leases.

### A.  Bright-Line Test

I agree with the bankruptcy court, and find *In re Buehne Farms* instructive.  That case involved a dairy farmer/debtor who argued his fifty-month cattle leases were disguised as security agreements when his lessors motioned the bankruptcy court to extend the time for the debtor to assume or reject fifty month cattle leases.  *In re Buehne*, 321 B.R. 239 at 240.  The debtor obtained his cattle via two leases with third party buyers.  *Id*. at 241.  The *Buehne Farms* leases are almost identical to Purdy's leases.  *Id*.  The *In re Buehne* court found that the average dairy farmer culls at an annual rate of twenty to thirty percent and the debtor's cows had a forty-eight month economic life.  *Id*. at 242.  The *In re Buehne Farms* court found the economic life of a dairy cow could range from thirty-six to sixty months.  *Id*.

Sunshine argues this case is distinguishable because the leases Purdy signed did not have purchase options.  Although this is true, I find this case is instructive because it offers guidance on the economic life of dairy cows given a farmer's culling practices.

We review the bankruptcy court findings of fact under the clear-error standard.  *B–Line, LLC v. Wingerter (In re Wingerter)*, 594 F.3d 931, 935–36 (6th Cir. 2010) (citing *Behlke v. Eisen (In re Behlke)*, 358 F.3d 429, 433 (6th Cir. 2004)).  Under this standard, the reviewing court must ask whether the bankruptcy court's factual findings were erroneous.

The bankruptcy court in this case heard similar testimony about cull rates and the practices on the Purdy farm.  *Id*. at 537.  The bankruptcy court determined that Purdy had a thirty percent cull rate.  *Id*. at 533.  This rate causes nearly complete herd turnover after thirty-six

months.  I agree with the bankruptcy court's determination that the individual heads of cattle are the good at issue.  Each head of cattle was a means of production rather than part of a unit.  For Purdy, each cow was a sophisticated piece of equipment that produced a product; milk.  The economic life of the individual heads of cattle would not last the term of the lease.  Any cows on Purdy's farm at the end of the lease term would not be the original cows because he would have culled those cows from the herd.  In fact, Purdy would have culled nearly all of the cattle from Lease 1 at the time of the petition.  Thus, the agreements were for a period longer than the cows' economic value to Purdy.  The lease and Sunshine's testimony speak to total herd maintenance over the lease term, but this was not important to the parties.  The parties did not follow these provisions of the lease.  This finding was within the economic life range used by the *In re Beuhne Farms* court who heard similar testimony regarding culling practices.  I find no error in the bankruptcy court's factual finding of a thirty month culling rate.  Therefore, I do not agree with the majority.  Unlike the majority, I would hold the Bright-Line Test is met and the leases were *per se* security agreements.

## B.  Economic Realities of the Transaction

The majority finds that the leases fail the Bright-Line test.  A lease agreement can fail the Bright-Line test, which is inevitable when the herd is the relevant good, and the court can still find that an agreement creates a security interest.[1]  *See* A.R.S. § 47-1203(A); *In re Phoenix Equip., Co., Inc.*, 2009 WL 3188684 at *10 (stating the facts of a case can determine whether a lease is a security agreement).  It is my view that the economics of the transactions do not support a finding that the parties entered into lease agreements, and Citizens bore the burden of establishing the documents were not what they purported to be.

The UCC and its Arizona adaptation offer very little guidance to courts on how to analyze the economics of a transaction.  A common factor courts use is whether the lessor has a reversionary interest in the leased goods or an option to purchase. Id.  Courts are not limited to these factors.  *In re WorldCom, Inc.*, 339 B.R. 56, 72 (Bankr. S.D.N.Y. 2006).  In fact, by limiting itself to these factors, the court conducts a similar analysis to the Bight-Line test.  *In re*

---

[1]Sunshine argues that the herd is a perpetually self-renewing asset.

*Phoenix Equip. Co., Inc.*, 2009 WL 3188684 at * 10 (holding parties course of dealings was a relevant factor in determining whether leases were security interests).  Courts should focus on other relevant facts at the time of the agreements.  Id.

*In re Phoenix Equipment Co. Inc.* is distinguishable from this matter because it also involves a purchase option.  *Id*. at *11.  The *In re Phoenix Equip. Co., Inc.* leases did not provide for an option in the language of the lease, but the court inferred the option by analyzing the parties' course of dealings.  *Id*.  When the parties could not establish whether the purchase price on the option was nominal, the *In re Phoenix Equipment Co., Inc.* court focused on the structure and effect of the parties' transactions.  *Id*.  (stating the court must consider the agreements within the context of the parties' relationship).  The debtor needed capital in order to run his operation and entered into transactions in which he transferred title of equipment to his creditor in exchange for the capital.  *Id*.  The court concluded the nature of the transactions showed that the debtor did not need a lease agreement, but needed capital to continue operating.  *Id*. at *12.

In the three relevant leases, third parties sold cattle to Purdy.  Sunshine reimbursed Purdy for the cost of the cattle.  Sunshine knew Purdy did not adhere to the replacement cattle provisions in its agreements, but chose to ignore his non-compliance.  Sunshine was aware of Citizens' lien at the time it entered into the transactions and filed its statements.  The facts of the case at the time of the transaction indicate that Purdy needed money to place cows on the farm.  Sunshine, by the way it forwarded funds to Purdy, appears to have supplied Purdy with funds rather than the actual cattle.  Sunshine received a lien on the cattle whose acquisition it financed.  These facts indicate the parties entered into three financing transactions rather than three lease transactions.

Furthermore, the reimbursement sheds doubt on Sunshine's characterization of the leases as finance leases under Article 2A.  Under Arizona's adaptation of the UCC, finance leases have three characteristics.  A.R.S. 47-2A103(A)(7).  First, the lessor does not select, manufacture, or supply the goods.  *Id*. at (a).  Second, the lessor acquires the goods or a right to possess and use of the goods in connection with the lease.  *Id*. at (b).  Purdy selected the cattle, and the cattle were branded in accordance with Exhibit B of the lease, which creates a presumption of ownership.  Third, one of three events involving the lessee must occur.  *Id*. at (c).  The lessee

must, before signing the lease, receive a copy of the contract by which the lessor acquired the goods. *Id*. Alternatively, lessee approval of the contract by which the lessor acquired the goods can be a condition of the effectiveness of the lease. *Id*. Last, the lessee, prior to signing the contract, "receives an accurate and complete statement designating the promises and warranties, and any disclaimers of warranties, limitations or modifications of remedies, or liquidated damages, including those of a third party, such as the manufacturer of the goods, provided to the lessor by the person supplying the goods in connection with or as part of the contract by which the lessor acquired the goods or the right to possession and use of the goods[.]" *Id*. It is not clear from the record whether any of these three instances occurred.

Purdy purchased the cattle, and there is no indication in the record Purdy approved or saw a contract or any warranties or promises the third-party buyer would have given to Sunshine. Sunshine only has invoices and bills to indicate it paid for cattle that Purdy already had on his farm. Sunshine has not shown its leases meet the statutory requirements of the finance lease. Thus, the bankruptcy court did not err by relying on the parties' post lease conduct in reaching its conclusion. Testimony reveals Sunshine acquiesced in Purdy's decision to sell the cattle, and use the funds to either purchase more cattle or deposit the sale proceeds in his Citizens' account. It was not error for the bankruptcy court to rely on the fact that Purdy acquired the cattle from third parties and Sunshine reimbursed these parties. This arrangement was tantamount to Sunshine financing the acquisition of cattle for Purdy's dairy operation. Moreover, Sunshine failed to come forward with evidence it actually owned the cattle delivered by the third party buyers, which calls into question the leases status as finance leases. I would hold the economics of the transaction support a finding that the parties entered into security agreements for the cattle rather than leases.

For these reasons, I respectfully dissent and would affirm the bankruptcy court's decision.